675 So.2d 754 (1996)
Kevin M. JONES
v.
PEYTON PLACE, INC., d/b/a Howard Johnsons and CNA Insurance Company.
No. 95-CA-0574.
Court of Appeal of Louisiana, Fourth Circuit.
May 22, 1996.
*758 Al M. Thompson, Jr., Hulse, Nelson & Wanek, New Orleans, for Defendants/Appellants, Management Equities, Inc. d/b/a Howard Johnson's East Motor Lodge and Transcontinental Insurance Company.
Allen R. Ingram, Law Offices of Allen R. Ingram, Lafayette, for Plaintiff/Appellee, Kevin Jones.
Before BYRNES, CIACCIO and MURRAY, JJ.
MURRAY, Judge.
On April 16, 1989, Kevin Jones tripped and fell on buckled carpeting in a building owned and operated by Management Equities Corporation, d/b/a Howard Johnson East Motor Lodge and Howard Johnson Company. The fall propelled Mr. Jones through the glass door in front of him and into a brick wall. Mr. Jones had lacerations to his forehead, hands and chest, and also claimed resultant injuries to his neck, lower back and left knee.
Mr. Jones subsequently sued Management Equities and its liability insurer, Transcontinental Insurance Company, asserting both *759 negligence and strict liability as the cause of his damages. When the matter was brought to trial, a jury found Management Equities' negligence was the sole cause of Mr. Jones' injuries, assigning 100% fault to the defendant and none to Mr. Jones. The plaintiff was awarded $26,000 for past and future medical expenses and $205,000 in general damages, including disfigurement and mental anguish resulting from the accident. The trial court entered judgment on the jury verdict, and Management Equities moved for a JNOV and/or new trial and/or remittitur. These motions were denied, and the defendants now appeal.

LIABILITY FOR NEGLIGENCE
Five elements must be established to recover for negligence: (1) duty, (2) a breach of that duty, (3) cause-in-fact, (4) legal cause, or scope of liability, and (5) damages. Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992). While the existence of a legal duty is a question of law, the determination that the duty has been breached is a question of fact. Mundy v. Dept. of Health & Human Resources, 620 So.2d 811, 813 (La.1993). Such a factual finding cannot be reversed on appeal unless found to be clearly wrong on the entirety of the evidence. Ferrell v. Fireman's Fund Insurance Co., 94-1252, p. 4 (La. 2/20/95), 650 So.2d 742, 745, and cases cited therein.
Management Equities contends that the jury's finding that it was negligent and 100% at fault in causing this accident is clearly erroneous because there was no evidence that it either knew or should have known of the allegedly dangerous defect in the premises.
It is well-established that under our law,
"[t]he owner of immovable property has a duty to keep the property in a reasonably safe condition and must discover any unreasonably dangerous condition or warn potential victims of its existence. The plaintiff must prove the owner knew or should have known of the risk. The property owner is not the insurer of the premises, but must act reasonably in view of the probability of injury."
Wiggins v. Ledet, 94-0485, p. 6 (La.App. 4th Cir. 9/29/94), 643 So.2d 797, 801 (emphasis added) (citations omitted). The mere existence of a hazard does not create liability for negligence; instead, it must be shown that the condition was present long enough for the defendant to discover and remedy the problem. DeGruy v. Orleans Parish School Bd., 573 So.2d 1188, 1192 (La.App. 4th Cir. 1991). Thus, the first issue to be decided is whether the jury's implicit finding that Management Equities breached its duty by failing to discover the defect in the carpet was a reasonable conclusion based on the evidence presented.
The building in which this accident occurred was leased to Southern University at New Orleans (SUNO) for use as a dormitory for student athletes. According to the lease, and as confirmed by the testimony of Donald Guastella, who was then co-manager of Howard Johnson East, Management Equities retained custody and control of the leased premises. When questioned about the meaning of this provision, Mr. Gaustella agreed that if a light bulb burned out or the carpets needed cleaning, Management Equities would take care of it; neither SUNO nor the residents were responsible for maintenance or repairs.
Mr. Jones, who was 27 years old at the time of trial in 1994, was attending SUNO in the Spring semester of 1989 on a basketball scholarship and was therefore assigned to reside in this dormitory. On Sunday, April 16, 1989, Mr. Jones spent most of the day going to church and shopping, but returned to the residence in time for the evening meal provided by the facility. A fellow student called Mr. Jones to the front of the building because there was someone waiting to see him. As Mr. Jones walked towards the main doors, he tripped over a bulge or wrinkle in the carpet that apparently had formed because the edge had pulled loose from under the door frame. Mr. Jones testified that he had not seen the bulge in the carpet until after he had fallen over it, even though he regularly used that particular door for coming and going to and from the dormitory. He therefore had no knowledge of how long it had been there.
*760 Two photographs taken "about two days after the accident" were entered into evidence by the plaintiff. One photo clearly shows a wrinkle of loose carpeting on the right side of a hallway, between two to four feet in front of an open glass door. This wrinkle appears to be about three to four feet in length, about three inches in maximum width and rising between one to two inches above floor level.[1] The second photo, taken from a greater distance than the first, shows there was another, smaller area of loose, wrinkled carpeting further from the doorway and on the left side of the hallway. The pictures show, and Mr. Jones testified that, the lighting in the area was adequate. He also stated he was proceeding at a normal pace and generally watching where he was going before he fell. Besides Mr. Guastella's testimony concerning carpet cleaning and light bulbs, the only evidence concerning custodial care appears in the written lease, which provides that one of the landlord's duties was that "[r]ooms are to be vacuumed weekly." There was no further testimony or evidence presented concerning the origin, duration or nature of the defect.
We find that on this evidence, the jury's decision that Management Equities was negligent was clearly wrong. There was absolutely no evidence suggesting that anyone previously had complained of any problem with the carpeting or notified any Howard Johnson employee that the carpet had pulled loose or had buckled. Therefore, there was no proof of actual notice to the defendant.
Nor is there any basis in the evidence for an inference of constructive notice. The only testimony concerning the condition of the carpet was that of Mr. Jones, who stated that despite his regular use of this corridor over an extended period of time, he had not seen the bulge until after he had fallen. In fact, he had used this entrance several times on the day of this accident, but had not previously noticed any defect. In view of the building's use as a dormitory for student athletes, prone to horseplay and/or roughhousing, it is no more likely that the carpet had gradually pulled loose from normal wear than that it had been suddenly torn from under the door frame only shortly before Mr. Jones fell. Thus, the existence of the defective condition does not support the inference that Management Equities, through its custodial or other employees, had an opportunity to discover the condition and take measures to prevent the type of harm that resulted in this case. Failing proof of this essential element, the jury could not reasonably find the defendant negligent.

STRICT LIABILITY
In this case, both the facts and the pleadings indicate that Mr. Jones had a potential claim based upon strict liability as well as negligence. However, the jury was given no instructions, nor asked to complete special interrogatories, for finding an owner or custodian strictly liable for harm arising from a defect in his premises. Management Equities argues that this failure prevents consideration of a strict liability claim on appeal, and points out that Mr. Jones' counsel did not object to the omission, despite the following colloquy at the end of closing arguments:
By the Court: Before giving my closing instructions to the jury, I would like the record to reflect that I have gone over the closing instructions, as well as the jury interrogatories, and of course the special jury charges, and both plaintiff's attorney and defense's attorney have found those to be accepted [sic]. I'd like that affirmed on the record. Mr. Ingram?
Plaintiff's counsel: Yes, your honor, that's correct.
By the Court: And Mr. Thompson?
Defense counsel: Yes, that's correct, your honor.
Under Article 1792 B of the Code of Civil Procedure, a trial court has the duty to give accurate and necessary jury instructions based upon the particular facts and evidence of the case. Delphen v. Dept. of Transportation & Development, 94-1261, p. 4 (La.App. 4th Cir. 5/24/95), 657 So.2d 328, 332, *761 writs denied, 95-2116, 95-2124 (La. 11/17/95), 663 So.2d 716-17. The next provision, Article 1793 C, states that "[a] party may not assign as error the giving or the failure to give an instruction unless he objects thereto." It has been held, however, that when the jury instructions contain the kind of plain, fundamental error as demonstrated here, the failure to object cannot prohibit appellate review of the tainted judgment. Guidry v. Bank of LaPlace, 94-1758, p. 9 n. 10 (La.App. 4th Cir. 9/15/95), 661 So.2d 1052, 1058 n. 10, writs denied, 95-2477, 95-2490, 95-2498 (La. 1/5/96), 666 So.2d 295-96; Wilson v. National Union Fire Ins. Co., 27,702, p. 6 (La.App. 2d Cir. 12/6/95), 665 So.2d 1252, 1258-59; see also Trans-Global Alloy Ltd. v. First National Bank, 583 So.2d 443, 448 (La.1991). Instead, since the legal error in the trial court is seen to have interdicted the fact-finding process, a de novo review of the record is required. Ferrell v. Fireman's Fund, 94-1252, p. 4, 650 So.2d at 747. We therefore will determine, based on the evidence presented, whether Mr. Jones is entitled to recover damages based upon Management Equities' status as owner/custodian of the premises at issue.
While a claim for negligence against the custodian of defective premises requires proof of the defendant's knowledge of the alleged defect, liability under Civil Code article 2317 may be established by showing only that: (1) the defendant had the care, custody and control of the thing causing harm, (2) a vice or defect in the thing created an unreasonable risk of harm, and (3) the plaintiff's injuries were caused by that vice or defect. Fontenot v. Fontenot, 93-2479, p. ___ (La. 4/11/94), 635 So.2d 219, 221. In this case, the first element is established by the unrefuted testimony of Donald Guastella, previously noted, that Management Equities was both the owner and custodian of the building in which Mr. Jones was injured.
With regard to the defect's presentation of an unreasonable risk of harm, our Supreme Court has stated:
The judicial process involved in deciding whether a risk is unreasonable under Article 2317 is similar to that employed in determining whether a risk is unreasonable in a traditional negligence problem, and in deciding the scope of duty or legal cause under the duty/risk analysis. This is not because strict liability under Article 2317 is equivalent to liability for negligence, but because in both delictual areas the judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community.
Because of the similarities in these ... inquiries, it has been suggested that a useful approach in a case under article [sic] 2317 might be to ask the following: If the custodian of the thing is presumed to have knowledge of its condition before plaintiff's injury, would he then have been acting reasonably by maintaining it and exposing others to it?
Entrevia v. Hood, 427 So.2d 1146, 1149-50 (La.1983) (citations omitted). Under this analysis, the court must not only "balance the likelihood and magnitude of harm against the utility of the thing," but must also consider whether the duty imposed upon the custodian was meant to prevent the type of harm which occurred. Oster v. Dept. of Transportation & Development, 582 So.2d 1285, 1289 (La.1991) (footnote and citations omitted).
In this instance, Management Equities' duty to keep its passageway free of hazards is meant to prevent just such falls as occurred here. Although this doorway was not the only one in the building, it was the main entrance and served both the residents and any visitors they might have. Since this area experienced heavy traffic, any impediment to a safe passage gives rise to an increased probability of harm. Additionally, permitting an area of buckled carpeting to form so near to the glass doors created a likelihood that the magnitude of harm would be greater should someone trip and fall. While the use of carpeting, rather than bare floors, serves to prevent accidents caused by slipping, the carpet's utility is greatly reduced when, as here, it becomes loose and buckled. In sum, assuming that Management *762 Equities knew of the carpet's condition in this entranceway, it was not reasonable to allow it to remain in this condition without providing any warning of a hazard. We therefore find that this defect in the carpeting presented an unreasonable risk of harm.
The final element of a strict liability claim is that of causation. At trial, Management Equities presented evidence to challenge Mr. Jones' credibility[2] and to suggest that his injuries on April 16, 1989 resulted from his attempt to climb a barbed wire fence behind this facility rather than from a fall through the glass door. Despite this presentation, the jury, after being instructed on both assessing credibility and proximate cause, found that Mr. Jones had been injured by the defendant's negligence. Since the standards for deciding causation are the same whether a claim is based on negligence or strict liability, Fontenot v. Fontenot, 93-2479, p. ___, 635 So.2d at 221, and the fact-finding process on this element was not tainted by legal error, the jury's determination may not be reversed unless it is found to be clearly wrong or manifestly erroneous, Ferrell v. Fireman's Fund, 94-1252, pp. 3-4, 650 So.2d at 745. We find no such error here. Therefore, Management Equities is strictly liable to Mr. Jones for the injuries resulting from this accident.

COMPARATIVE FAULT
In addition to challenging the issue of liability, Management Equities asserts on appeal that the jury's failure to find that Mr. Jones' own negligence contributed to his injuries was manifestly erroneous.
Once an owner has been found strictly liable for harm arising from his premises, he is responsible for the plaintiff's damages unless he establishes victim fault, third party fault, or causation by an irresistible force. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1113 (La.1990). If victim fault is established, it must be determined on a case-by-case basis "whether reducing the negligent plaintiff's recovery would serve as an incentive for similarly situated plaintiffs to exercise care, while not reducing the incentive of the owner of the thing to remove the risk of harm." Id., citing Landry v. State, 495 So.2d 1284 (La.1986). The factors to be used to compare degrees of fault were set forth in Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967, 974 (La.1985): (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) whether the capacities of the actors were superior or inferior; (5) whether any extenuating circumstances required the actor to proceed without proper thought, and (6) the relationship between the actor's conduct and the harm to the plaintiff.
The determination of whether comparative fault applies in a particular case is essentially a factual one and subject to the manifest error standard on appellate review. Clement v. Frey, 95-1119, 95-1163, p. 7 (La. 1/16/96), 666 So.2d 607, 610-11. Only if the apportionment of fault is found to be clearly wrong can an appeals court adjust percentages, and then only to the lowest/highest point within the factfinder's reasonable discretion. Id. at pp. 7-8, 666 So.2d at 611.
Applying these precepts to the evidence presented here, we find that the jury's failure to find Mr. Jones comparatively negligent was manifestly erroneous. Mr. Jones testified that he was unaware of the carpet's condition, yet the evidence establishes that this was an open and obvious defect in a well-lighted area. While Management Equities was in a superior position to warn of the hazard, no evidence suggests there were any extenuating circumstances to prevent Mr. Jones from seeing what he should have seen, such as distractions in the hallway or a need for haste. Both the failure to repair the carpet and the failure to notice the defect can be seen as direct causes of the plaintiff's injuries. However, since Management Equities is assumed to have been aware of this condition in its premises, and since its conduct created a risk to all those using this entranceway, not just Mr. Jones, its relative *763 fault is greater. After considering the Watson factors we find that the lowest percentage of fault a reasonable factfinder should have allocated to Mr. Jones under these circumstances was 30 percent. While such a reduction in the plaintiff's recovery will encourage others to exercise reasonable care for their own safety, the incentive for a property owner to prevent such accidents, by either repairing or warning of similar hazards, remains. Accordingly, the damages awarded to Mr. Jones shall be reduced by thirty percent (30%) based upon his comparative fault.

QUANTUM
The remaining three assignments of error urged by Management Equities relate to the general damage award of $205,000, itemized by the jury as follows:

Injury to his neck $ 5,000.00
Injury to his knee 50,000.00
Injury to his lower back 20,000.00
Laceration/cut on his chest &
 other cuts and lacerations 80,000.00
Permanent disfigurement and
 mental anguish 50,000.00

1. Evidence of plaintiff's incarceration
Management Equities asserts that the jury's award for mental anguish is excessive because the trial court improperly excluded evidence that Mr. Jones was serving a jail sentence for drug charges. It is argued that since "[t]here is only so much mental anguish that a person can suffer," the anguish of incarceration would have been seen to outweigh any suffering that resulted from Mr. Jones'"minimal injuries."[3] Management Equities thus contends that this evidence was not only relevant but essential for the jury to properly assess damages for mental anguish.
Evidence is relevant if it tends to prove or disprove a material fact. La.Code Evid.Ann. art. 401. Irrelevant evidence is inadmissible, and even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues." La.Code Evid.Ann. arts. 402-03. A trial court's rulings on such evidentiary issues will not be disturbed unless a clear abuse of discretion is shown. Jure v. Raviotta, 612 So.2d 225, 229 (La.App. 4th Cir.1992), writ denied, 614 So.2d 1257 (La.1993).
Even assuming, as the defendant argues, that Mr. Jones' incarceration would be in some way relevant to the physical and mental pain and suffering from his injuries, we agree with the trial court's determination that whatever probative value this evidence has is extremely low when weighed against its potential prejudice to Mr. Jones. Recognition of the prejudicial effect of a criminal history in a civil case is found in Article 609 of the Code of Evidence, which strictly limits the admissibility of such evidence when offered to impeach a party or witness. See, e.g., Dixon v. Winn-Dixie Louisiana, Inc., 93-1627, p. 8 (La.App. 4th Cir. 5/17/94), 638 So.2d 306, 314. Furthermore, Management Equities was properly permitted to elicit Mr. Jones' admission that, subsequent to the accident at issue, he had pled guilty to two felony counts of possession with intent to distribute cocaine. Under these circumstances, we find no abuse of discretion in the trial court's decision to prohibit evidence of Mr. Jones' incarceration.

2. Damages for orthopedic injuries
Management Equities contends that the jury's award of damages for the alleged injuries to Mr. Jones' neck, knee and lower back is erroneous because he failed to show to what extent this accident, as opposed to the several prior and subsequent accidents he was involved in, caused his harm. Alternatively, it is argued that the $75,000 award for these soft tissue injuries is excessive.

A. Causation
The plaintiff in a personal injury action must prove by a preponderance of the evidence that the claimed injuries resulted from the accident at issue. Maranto v. Goodyear Tire & Rubber Co., 94-2603, p. 3 (La. 2/20/95), 650 So.2d 757, 759. This burden of proof is met if medical testimony establishes that it is more probable than not that subsequent injuries were caused by the trauma suffered in the incident. Id. A presumption *764 of causation will aid a plaintiff in meeting this burden,
if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Housley v. Cerise, 579 So.2d 973, 980 (La. 1991); see also Juneau v. Strawmyer, 94-0903, pp. 4-6 (La.App. 4th Cir. 12/15/94), 647 So.2d 1294, 1298-99. To rebut this presumption, "defendant must show some other particular incident could have caused the injury in question." Maranto, 94-2603, p. 6, 650 So.2d at 761. This issue is a factual one, reviewed by an appellate court under the manifest error standard. Id., p. 7, 650 So.2d at 761.
The evidence shows that immediately after this accident, Mr. Jones sought treatment at the emergency room of Pendleton Memorial Methodist Hospital. Cuts and lacerations on his chest, forehead, hands, right wrist and forearm were cleaned and closed. He made no complaints concerning any other injuries. However, as Mr. Jones testified, his knee "started acting up" a few days later, and he began suffering headaches and shoulder pain.
Approximately two months later, on June 26, 1989, Mr. Jones was referred by his attorney to an orthopedic surgeon, Dr. Louis C. Blanda, Jr., who testified via deposition. Mr. Jones' initial complaint was of pain in his neck, left shoulder, left arm and left knee; he told Dr. Blanda that he had not had any prior injuries to these areas of his body. On August 21, 1989, Mr. Jones first complained to Dr. Blanda of back pain. During a two-year course of treatment, Dr. Blanda found no objective signs of injury despite his use of all available testing methods.[4] After referral to an expert in physical therapy and rehabilitation was unsuccessful in relieving Mr. Jones' reported pain, Dr. Blanda advised him he would have to learn to live with his symptoms by using common sense in his physical activities. The final diagnosis was of muscular or sprain-type injuries, with no permanent disability. Dr. Blanda's notes showed only one other accident was reported to him: a fall suffered between Mr. Jones' visits in December 1989 and March 1990 which reportedly had caused a flare-up in his back pain.
In contrast to Dr. Blanda's records, Mr. Jones testified at trial that he had injured his neck and back in an August 25, 1986 accident and that his neck had also been hurt on August 3, 1987. He further admitted that an automobile accident in December 1988 resulted in a lawsuit in which he claimed to have injured his back, neck and left knee. This knee injury was minor, he testified, and had fully healed before the incident at issue here. It was shown on cross examination that during a December 1989 deposition in connection with that lawsuit, Mr. Jones' only response to a question about the injuries he had suffered at the Howard Johnson's in April 1989 was to mention his cuts and lacerations; he specifically denied any problems at that time with his neck or lower back.
Mr. Jones also testified at trial that subsequent to this incident in April 1989, he had injured his back and neck in another automobile accident on July 22, 1989. After a slip-and-fall in Wal-Mart in January 1990, he had filed a suit in which he claimed damages for injuries to his back, tailbone and hip. Additionally, he had injured his neck in a motor vehicle accident on August 7, 1990.
Dr. Blanda was not asked whether Mr. Jones' injuries and subsequent treatment were caused by this incident, nor was he questioned concerning the possible effect the other various accidents might have had on Mr. Jones' condition. Management Equities did not present the testimony of any other orthopedist, nor was Mr. Jones asked how he *765 distinguished his prior and subsequent injuries from those suffered in this incident. Although a medical report was admitted into evidence to show Mr. Jones had been examined by a doctor three days after the accident in December 1988, no evidence was produced to suggest that any further treatment was undertaken.[5] Mr. Jones was not asked whether or not he had any residual problems from any prior accidents, but testified only that after this accident, his back continued to bother him for one-and-a-half to two years, and that the back injury had been "re-activated" by his fall at Wal-Mart. His only residual symptom from the accident at the Howard Johnson's, he said, was that his left knee "makes a loud cracking sound," which he demonstrated for the jury. Mr. Jones testified that he had not had this "popping" problem until after April 1989, despite the earlier knee injury in the car accident. At the time of trial, he still had occasional pain in his knee.
The evidence thus shows that, despite the accidents preceding the one at issue here, Mr. Jones had just been awarded a college basketball scholarship. There was nothing presented at trial to suggest that he was then suffering any symptoms or being treated for any injuries. Therefore, the jury reasonably could conclude that Mr. Jones was in good health prior to this April 1989 accident. Furthermore, his testimony and that of Dr. Blanda establish that shortly after the accident, Mr. Jones began experiencing symptoms of injury to his left knee and neck, as well as his shoulder and arm. According to Dr. Blanda, nothing in his medical findings gave him cause to doubt Mr. Jones' description of the manner in which he was injured. None of the subsequent accidents resulted in claims of a knee injury, and Mr. Jones made no complaints to Dr. Blanda regarding his neck after June 26, 1989. Therefore, Management Equities failed to show that "some other particular incident could have caused" these injuries, as required to rebut the presumption of causation. Accordingly, the jury's conclusion that the injuries to Mr. Jones' neck and left knee were caused by his fall through the door on April 16, 1989 is fully supported by the evidence.
The same cannot be said, however, in regard to Mr. Jones' claim of a back injury resulting from this accident. Mr. Jones made no mention of any back problems during his initial visit to Dr. Blanda, nor when he returned in July 1989 and was referred to a physical therapist. It was not until August 21, 1989 that Mr. Jones reported pain in his back along with "a snapping or cracking sensation." Significantly, this report followed the motor vehicle accident of July 22nd in which Mr. Jones also claimed to have injured his back. Therefore, it was not shown that any symptoms of a back injury "appear[ed] and continuously manifest[ed] themselves" after this accident, but instead that "some other particular incident could have caused the injury in question." There is thus no reasonable factual basis for the jury's determination that this incident caused any injury to Mr. Jones' back. Since the award of damages for this claim is manifestly erroneous, it must be reversed and vacated.

B. Excessiveness
The Supreme Court has delineated our function when a general damage award is challenged on appeal:
[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
* * * * * *
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact.... Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest *766 point which is reasonably within that discretion.
Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994) (citations omitted). In determining whether an abuse of discretion has been shown, the relevant evidence must be viewed in the light which offers the most support to the trial court's judgment. Id. at 1261.
Applying these standards, we find no abuse of discretion in an award of $5,000 for the injury to Mr. Jones' neck. Although Dr. Blanda's notes do not reflect any complaints of neck pain after the initial examination on June 26th, Mr. Jones' symptoms were significant enough to require both an x-ray on that date and a bone scan, involving injection of a radioactive isotope, in July 1989. The physical exam showed tenderness in the neck muscles and some limitation in range of motion. In December 1989, Mr. Jones had testified that he was no longer having problems with his neck. Thus, the jury reasonably could conclude that Mr. Jones had a soft tissue injury that caused pain upon movement for a period of three to six months. On these particular facts and circumstances, it cannot be said that the award of $5,000 is in any way arbitrary or capricious, and it is therefore affirmed.
Similarly, the evidence regarding Mr. Jones' knee injury supports the jury's award. While no objective signs of cartilage, ligament or other structural damage was found, Dr. Blanda found it necessary on several occasions to prescribe anti-inflammatory drugs to control the pain and swelling. In October 1989, he injected the knee with cortisone. The recurrent symptoms necessitated both an MRI in August 1989 as well as a diagnostic arthroscopy, under general anesthesia, in January 1991. As late as May 1991, Mr. Jones was given antibiotics for tendinitis or infection in the knee. Additionally, although Mr. Jones had been attending college on a basketball scholarship, Dr. Blanda testified that with these symptoms, he thought that the wiser course was to limit physical activities to only "recreational sports."[6] Despite Dr. Blanda's opinion that a permanent disability rating was not warranted, he released Mr. Jones with the admonition that he would have to adjust his activities to accommodate this condition and learn to live with intermittent pain. Although the jury's award of $50,000 for this knee injury appears to be at the high end of an appropriate range of damages, we find no abuse of discretion and affirm the award.

3. Damages for lacerations, disfigurement and mental anguish
Management Equities also claims that the jury's awards of $80,000 for Mr. Jones' pain and suffering from the cuts and lacerations and $50,000 for his disfigurement and mental anguish were excessive.[7] We must therefore review the evidence concerning these injuries under the previously cited Youn standard.
Dr. John M. Langley testified that he was on duty at the Pendleton Memorial Methodist Hospital emergency room on April 16, 1989 when Mr. Jones sought treatment for cuts and lacerations said to have resulted from a fall through glass. Examination revealed an eight-centimeter superficial laceration across the chest, a three-centimeter laceration on the back of the right hand, a one-and-two-tenths-centimeter laceration of the right wrist, and one-centimeter cuts on the forehead, the middle finger of the left hand, and the right forearm. The wounds were irrigated and checked for foreign bodies, and x-rays were taken of the chest and wrist. While Dr. Langley's notes reflect that some of the cuts were stitched up, the records did not show which injuries required sutures or how many stitches were used. No evidence of any internal injuries was found, and Mr. Jones was released with instructions on wound care and to have the stitches removed *767 in seven days. In Dr. Langley's opinion, once the sutures were removed Mr. Jones would have no restrictions on his activities.
Dr. Darrell L. Henderson, a plastic and reconstructive surgeon, first saw Mr. Jones on October 2, 1989. Dr. Henderson was told about the accident, and that injuries to the left knee and shoulder were being treated by another physician. He was also told that stitches in the chest, forehead and hand had been removed by a SUNO nurse. Mr. Jones told the doctor he had healed well, but he still had some tenderness in the scar on his right wrist and the scar on his chest was "exceedingly painful."
Examination of the scars resulting from this accident showed that the one on the forehead, about one-third of an inch long, was healing well but could be considered "slightly disfiguring." Dr. Henderson explained this to mean that although the scar was not visible from about ten feet away, someone at a conversational distance of two or three feet could see it, though with some difficulty. The inch-and-a-half scar on the right hand and those on the finger, forearm and wrist seemed to have healed well, but Dr. Henderson noted that the latter appeared "a little bit nodular" and was slightly tender.
Dr. Henderson described the angular scar in the center of Mr. Jones' chest as about four inches in length and about a third of an inch wide. The scar was elevated, about a centimeter thick, and had suture marks around it, with a parchment-like appearance when manipulated. Dr. Henderson explained that this scar was hypertrophic: although actual healing was complete, the body's repair mechanism would not shut down and additional layers of unnecessary collagen continued to form. Because of the continued intense healing and increased blood supply, such scars characteristically burn, sting, ache and can be very painful. The process typically results in a very thick, elevated, "ropey" scar like that seen on Mr. Jones. Dr. Henderson's photographs of the scar were admitted into evidence and shown to the jury.
Mr. Jones told the doctor that the scar hurt anytime he moved his arms or chest, and that it was getting worse; the scar was getting wider and more painful. Dr. Henderson recommended laser surgery, which could help slow the overhealing and remedy the pain, but would have little effect on the appearance of the scar. Additionally, Mr. Jones was advised that the procedure would probably have to be repeated two or three times, maybe more, because African-Americans, such as he, had a greater tendency to develop this hypertrophy, especially on the chest. Because of this, Dr. Henderson could not recommend either surgical removal of the scar tissue nor dermabrasion; neither of these procedures would affect the overhealing process, while the laser did.
Mr. Jones had the laser surgery done under general anesthesia in late December 1989. Dr. Henderson testified that numerous tiny holes were drilled in the scar with the laser beam, followed by injection of a cortisone compound and a local anesthetic. On follow-up visits in January and March 1990, Dr. Henderson noted significant improvement in the appearance of the scar, and Mr. Jones reported that the pain, itching and burning had greatly decreased. However, at the latter visit Mr. Jones complained of tenderness around the edges of the scar, and Dr. Henderson found there were several areas in which the overhealing was continuing. Photos taken during this visit were also shown to the jury. The doctor recommended a repeat of the laser procedure and Mr. Jones said he wanted to have it done, but could not then afford it.
Dr. Henderson did not see Mr. Jones again until April 10, 1991, when more photographs were taken and an examination done. While the scar still looked better than before the laser surgery, the doctor found about a fifty-percent recurrence of the hypertrophy, and Mr. Jones reported increasing pain in the area. Although this pain from the scar did not limit his range of motion, Dr. Henderson informed him that it appeared he was one of the individuals who would require repeated laser surgery, possibly throughout his life, to prevent the excessive thickening and resultant pain. The doctor recommended yearly treatments, which would each be charged *768 separately to the patient at a cost of approximately $2,500 to $3,000 each time the procedure was performed. The only alternative would be cortisone injections, but this would work only if done when the new scar tissue was just beginning to form.
This evidence thus establishes that the initial cuts and lacerations did not appear serious, but nevertheless required some sutures and their subsequent removal. Except for the chest area, Mr. Jones' wounds healed well and left only a slightly tender, nodular scar on the wrist. However, the medical testimony establishes that the hypertrophic scar on the chest reasonably can be expected to cause extreme recurrent pain unless Mr. Jones undergoes repeated laser treatments, which themselves require anesthesia, antibiotics and topical anesthetics. On this evidence, we cannot say that the jury abused its much discretion in awarding $80,000 for his physical pain and suffering caused by the cuts and lacerations.
However, even when the evidence is viewed in the light most supportive of the verdict, we find that the jury's award of $50,000 for Mr. Jones' permanent disfigurement and mental anguish is "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances," Youn, 623 So.2d at 1261. The scar on Mr. Jones' chest is an irregularly textured and discolored area, clearly visible, even from a distance, but the scar on his forehead is barely noticeable. Although Dr. Henderson stated that nothing could be done to improve the appearance of the four-inch scar across the center of Mr. Jones' chest, the record is devoid of any evidence as to how Mr. Jones reacted to this disfigurement. While a scar such as this may be the cause of extreme anguish to a particular individual, there is nothing to support such a finding in this case. For this reason, we find that $25,000 will fairly compensate Mr. Jones for his permanent disfigurement.
For the reasons assigned, the judgment of the trial court is amended to provide that the defendants, Management Equities Corp., d/b/a Howard Johnson's East Motor Lodge and Transcontinental Insurance Company, are liable to Kevin Jones in the amount of $130,200.00, together with legal interest from the date of judicial demand until paid. As amended, the judgment is affirmed. Each party is to bear its own costs of appeal.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] These estimated measurements are the writer's, as there was no detailed testimony about the condition of the carpet. Mr. Jones merely responded affirmatively when his counsel asked if the photos depicted the scene where he had fallen.
[2] This evidence, concerning Mr. Jones' failure to disclose prior and subsequent accidents to his treating physicians, will be discussed later in the section on quantum in this opinion.
[3] Appellant's Brief at p. 23.
[4] The tests conducted included x-rays of the neck and left knee in June 1989; a bone scan of the knee in July 1989; an MRI of the knee in August 1989; a November 1989 MRI of the lower back; arthroscopy of the knee and a discogram of the lower back in February 1991. While the lumbar MRI showed a slight bulge of the disc at L5-S1, Dr. Blanda felt it was benign and not the cause of Mr. Jones' pain. This opinion was confirmed, he testified, by the negative discogram he later performed.
[5] We find nothing in the record to support defendant's statement, Brief p. 15, that Mr. Jones sought treatment from Dr. D.E. Bourgeois following the December 1988 accident.
[6] We note, however, that while Dr. Blanda's records show that Mr. Jones was no longer in school in March 1991, there is nothing to suggest that any of the claimed injuries caused Mr. Jones to either lose his scholarship or to discontinue his studies.
[7] Management Equities does not challenge the awards of $16,000 and $10,000, respectively, for past and future medical expenses.