807 So.2d 1063 (2002)
Regina Gonzales NUNEZ
v.
LOOMIS FARGO & CO., Patrice W. Johnson, Wells Fargo Armored Services Corporation, and Lumberman's Mutual Casualty Insurance Company.
No. 2000-CA-2519.
Court of Appeal of Louisiana, Fourth Circuit.
January 23, 2002.
*1064 Michael G. Gaffney, Nolan P. Lambert, New Orleans, LA, and Robert Angelle, Metairie, LA, Counsel for Plaintiff/Appellee.
Clare W. Trinchard, James L. Trinchard, David P. Curlin, Trinchard & Trinchard, New Orleans, LA, Counsel for Defendant/Appellant.
Douglas P. Matthews, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, Counsel for Intervenor/Appellant.
Court composed of Judge STEVEN R. PLOTKIN, Judge PATRICIA RIVET MURRAY, and Judge MICHAEL E. KIRBY.
MICHAEL E. KIRBY, Judge.
Defendants, Loomis Fargo & Co., Patrice Johnson, Wells Fargo Armored Services Corp., and Lumberman's Mutual Casualty Insurance Co., appeal the judgment of the jury trial which allocated 51.25% of the fault to the decedent, and 48.75% to the defendant driver.

STATEMENT OF THE FACTS
This case arises out of an automobile accident which occurred on the morning of October 8, 1997. Adam Nunez was employed by Murphy Oil U.S.A., Inc. as a supervisor area foreman. This position entailed making rounds through the plant. The plant was located on both sides of Highway 46. Therefore, many Murphy Oil employees, including Mr. Nunez, crossed the highway on a regular basis. Patrice Johnson, a driver for Wells Fargo Loomis, was assigned the route which required her to travel Highway 46. She was familiar with the highway and frequently observed Murphy Oil employees crossing it.
On the day of the accident, Mr. Nunez and Patrice Johnson were engaged in the usual activities of their jobs. Mr. Nunez, who used a bicycle to make his way through the plant, circled the lot while he waited for an eastbound vehicle to pass. Ms. Johnson, driving an armored truck and traveling in the westbound lane at about 30 miles per hour, was 284 feet away and slowing down to 25 miles per hour, because she saw Mr. Nunez waiting to cross. Mr. Nunez waited for a vehicle to pass in the eastbound lane and then darted across. Ms. Johnson saw Mr. Nunez enter the road suddenly and reacted by veering into the eastbound lane. In the driver's deposition she admits to the collision occurring in the eastbound lane. At trial she could not remember where collision occurred. The defendants' experts placed the accident in the westbound lane. The injuries Mr. Nunez sustained in the accident were the ultimate cause of his death.
At the time of the accident, Liberty Mutual had a policy of insurance in full force and effect which provided worker's compensation coverage to Murphy Oil. The policy provided for the payment of worker's compensation and medical benefits to any Murphy Oil employee who sustained *1065 an injury in the course and scope of employment. Because Mr. Nunez was in the course and scope of his employment when he was hit by Ms. Johnson, he and his dependents were entitled to such benefits.
Mr. Nunez's wife, Regina Nunez, filed suit on January 27, 1998, seeking compensation for damages and expenses related to her husband's injuries and death. The named defendants in the suit included Patrice Johnson, Loomis Fargo & Company, Wells Fargo Armored Services Corporation and Lumberman's Mutual Casualty Insurance Company. Upon notice of the filing of suit, Liberty Mutual Casualty Insurance Company intervened in the suit, seeking reimbursement of compensation and medicals paid, and a credit against any damage award Mrs. Nunez might collect for any future benefits that might be awarded.
Liberty Mutual paid the Nunezes $36,750.00 in death benefits. The parties did not dispute these totals, nor did they dispute the fact that Liberty Mutual would continue to pay Mrs. Nunez death benefits at a rate of $350.00 per week until judgment, if any, was executed. In fact, the parties signed a stipulation October 20, 1999, acknowledging such facts.
Trial of the matter was conducted before a jury from October 20, 1999 through October 26, 1999. The defendants made several objections at the jury charge conference, and in particular to the requested charge by plaintiff that a presumption of negligence must be attached to the defendant driver if the accident occurred in the eastbound lane of travel. Plaintiff further requested an instruction placing the burden on defendant driver to prove by clear and convincing evidence that she was not negligent. Defendants specifically objected to the instruction arguing that the facts did not warrant inclusion of the instruction, and more importantly the instruction did not apply as the bicycle was not an oncoming vehicle or a stationary object on the side of the highway. Defendants further objected noting that the instruction had too great of a potential to mislead and confuse the jury, as the jury was also instructed that the defendant driver's actions could be held to a lesser standard under the "sudden emergency doctrine." The court overruled the objections and specifically instructed the jury that it was to presume defendant driver was negligent for any accident occurring in a different lane of travel. Further, the trial court instructed the jury that the burden was upon defendant driver to show "by clear and convincing evidence" that the collision was not caused by her negligence.
At the conclusion of trial, the jury returned a verdict finding Mr. Nunez 51.25% at fault and the defendants 48.75% at fault. From this judgment the defendants appealed, specifically with regard to the allocation of fault and the jury instructions.
The jury's finding was adopted by the court, but it waited to rule on the issues concerning the allocation of costs and the intervenor's lien and future credit. The trial court asked for post-trial memoranda on the issues and ordered a Rule to Show Cause on January 14, 2000.
At the beginning of the hearing on the Rule to Show Cause, Liberty Mutual raised the issue of whether the court had jurisdiction over the issue of how its future credit should be taken. The court ultimately ruled that it did possess jurisdiction, and it continued with the hearing. Liberty Mutual argued that while the overall credit should be reduced by the percentage of fault that was allocated to Mr. Nunez, this reduction should be taken only once. Mrs. Nunez agreed that the credit should be reduced by Mr. Nunez's percentage of fault at the outset, but she disagreed as to the method by which the credit should be taken. Instead of allowing Liberty Mutual *1066 to cease paying the future death benefit while it took the credit, she contended that Liberty Mutual should continue to pay reduced benefits. Thus, Liberty Mutual would pay Mrs. Nunez $179.38 a week, 51.25% of $350.00, until it exhausted the credit. The court issued its ruling and oral reasons for its decision from the bench. This ruling was later followed by the written judgment, which was not accompanied by written reasons. According to the judgement, Mr. Nunez was 51.25% at fault and the judge defendants were 48.75% at fault. The total award was $477,959.15, 48.75% of which was due to Mrs. Nunez. Liberty Mutual was awarded a reimbursement for 48.75% of the paid death benefits which totaled 436,750.00 less costs and attorneys' fees, as well as a future credit of 48.75% of the excess, minus costs and attorneys' fees. Each future compensation payment would be reduced by 48.75% and once the credit was exhausted, the compensation payments would resume at 100%.
Liberty Mutual appeals (1) the district court's ruling that it possessed jurisdiction to decide how it is to exercise its credit and (2) its ruling that payments should continue during the time the credit is taken.

STATEMENT OF THE LAW

STANDARD OF REVIEW
We review this case de novo, because we find legal error in a jury instruction regarding liability, and because we find that error interdicted the fact finding process. Jones v. Peyton Place, Inc., 95-0574 (La. App. 4 Cir. 5/22/96), 675 So.2d 754, 760. Therefore, we will determine the allocation of fault and liability without reference to the trial court judgment on these and any issues that may have been affected by the incorrect jury instruction. Damages will be reviewed by the standard of abuse of discretion, all other issues will be reviewed by the standard of manifest error.
Under Article 1792 B of the Code of Civil Procedure, a trial court has the duty to give accurate and necessary jury instructions based upon the particular facts and evidence of the case. Delphen v. Dept. of Transportation & Development, 94 1261, p. 4 (La.App. 4th Cir.5/24/95), 657 So.2d 328, 332; Jones v. Peyton Place, Inc., 95-0574 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 760.
As stated above the court gave jury instructions, the questionable one being the following:
When a collision occurs between two vehicles, one of which is in the wrong lane of travel, there is a presumption that the driver in the wrong lane was negligent, and that the burden is on that driver to show that the collision was not caused by his or her negligence. The driver is required to exculpate himself of any fault, however slight, contributing to the accident.

Simon v. Ford Motor Company, 282 So.2d 126 (La.1973); Johnigan v. State Farm, 345 So.2d 1277 (La.App. 3 Cir. 1977)
The Simon and Johnigan cases presuppose that the driver seeking application of the presumption is on coming in the lane of travel into which defendant driver encroaches. Here, the decedent was attempting to cross the road and not in the opposing lane. The presumption would not apply against defendant driver because decedent had not been traveling in the lane where defendant encroached. Nor was decedent stationary in the lane into which the defendant veered. Because decedent was not on coming, this presumption is inapplicable.
In Duncan v. Safeway Insurance Co., 35-240 (La.App. 2 Cir. 10/31/01), 799 So.2d 1161, our brethren held that the wrong lane of travel presumption applies only in cases where a collision occurs in the wrong *1067 lane of travel as a result of a driver's loss of control of his vehicle: it does not apply against a passing driver in a collision with a left turn vehicle. Here, the defendant driver did not cross into the opposing lane out of control, but rather made a split-second decision to swerve in an attempt to avoid a collision.
We find the trial court was incorrect in giving said jury instruction. It follows that we find the trial court committed manifest error in applying the "wrong lane of travel presumption."

LIABILITY & ALLOCATION OF FAULT
Several people testified as to how this accident occurred. The only living eyewitness to the accident was the defendant driver. For two reasons we give her testimony more weight than the two defense experts. First, she actually was present and saw the accident, whereas the paid defense experts did not. Secondly, because the numbers the defense experts used to make their calculations are, at best, not sufficiently supported by the record and at worst contradictory to the record.
The defendant driver's relevant testimony at trial was as follows:
Q. When you first saw [decedent], you thought he was attempting to cross the street correct?
A. Yes.
Q. And he was going from your right to your left?
A. Yes.
* * *
Q. And when he stood up [on his bike] you realized he was coming straight out?
A. Yes.
Q. And you veered to the left to avoid hitting him?
A. Yes.
Q. And when you veered to the left you realized he was trying to cross the road right to left, correct?
A. Yes.
Q. [The decedent] is traveling straight across the highway, correct?
A. I wouldn't say he was straight crossing the road.
Q. Let me refer you to your deposition. I'll get it for you.
* * *
BY MR. ANGELLE (Plaintiffs counsel):
Q. Let me refer you to page 83 of your deposition where you were asked, "in which direction was [the decedent] going, was the bicycle traveling, after the time he stood up? Was he going straight across or did it veer in one direction or another?" And your answer was?
A. It was straight across.
Q. And when you collided with [the decedent] in your truck, it was in the eastbound lane, correct?
A. I really couldn't tell you where the impact was.
Q. Let me refer you to page 46 of your deposition.
* * *
Q. I asked you at Line 22, "and the point of collision was in the eastbound lane?" And your answer was
A. Yes.
* * *
Q. And the State Police wrote these letters POI in orange (referring to exhibit photo)?
A. Yes.

*1068 Q. Now is that pretty much where the point of impact between your truck and the bike was?
A. That's what I was told: That's where thethat's where I was told the impact was. I didn't see the actual impact.
Q. Let me refer you again to your deposition. Take the witness stand. Page 47, line 6. I asked you, "I believe the State Police marked the point of impact with orange POI. This is an even better picture. It's a close up picture. Was that in fact the point of impact?" And what was your answer?
A. Yes.
Q. Your answer was "Exactly" at line 10?
A. Pretty much. Yes.
* * *
Q. Now, let me ask you again. Was Adam's bicycle entirely in the eastbound lane of traffic at the time of the accident?
A. I didn't see the actual impact.
Q. Let me refer you to page 52 of your deposition at line 18. Okay?
A. Uh-huh. (Indicating affirmative response).
Q. Page 52, line 18. I had asked you, "Was his bicycle entirely in the eastbound lane at the time of the collision" and your answer was
A. Yes.
* * *
Q. Did you take your eyes off him at any time between the time you saw him and the time of the collision?
A. Once the truck crossed the center line, I lost contact.
We note that the defendant driver acknowledged what she remembered in her earlier depositionthat the impact was in the eastbound lane. She explained that she didn't see the decedent because she took her eyes off of him when she crossed the center line. In other words, the collision occurred after she crossed the center line.
The defense experts assumed, incorrectly, that defendant driver started veering after impact in the westbound lane. The defendant driver's testimony is to the contrary:
Q. And then you started veering over, too?
A. I started veering over once he completed his circle and stood up to come across.
Q. So your actions in applying the brake and veering over were simultaneous, at the same time?
A. Well I held the brakes and when he made his complete circle and stood up, that's when I started veering to the left to avoid it.
Q. When he made that circle you realized that he wasn't going to stop to let your truck pass?
A. Yes.
Q. That is correct?
A. Yes.
Q. And when [decedent] stood up after completing the circle, he was just on the edge of the roadway, correct?
A. Just started the edge, yes.
The defendant driver started veering to the left before the decedent ever entered the roadway itself. The reason she didn't see the collision is because she took her eyes off of him.
There is nothing in the record that would lead us to believe that the decedent did not cause this sudden emergency by darting out in front of Ms. Patrise Johnson, the defendant driver. Under the sudden emergency doctrine, Ms. Johnson is *1069 held only to act reasonably under the circumstances, even though absent the emergency brought about by someone else's negligence there would be a higher standard of care. Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (1972); Knight v. Samuel, 447 So.2d 587 (La.App. 3 Cir.1984).
Nevertheless, accepting the fact that decedent acted negligently in provoking an emergency by failing to yield to the right of way of oncoming traffic on the favored highway, it also is apparent from the record that had defendant driver not gone into the eastbound lane, she would not have struck the decedent. The defendant driver swerved in the same direction that the decedent was headed in an attempt to avoid the accident. This action was less than reasonable.
As for the testimony of the two defense experts, they posit numbers in their calculations that are contradicted or unsubstantiated by the record. For example, they calculate the speed of the truck to be thirty-five miles per hour. Where the testimony of defendant driver is clear that from the railroad tracks she had pumped the brakes to slow down to 25 mph. Not to mention she testified that upon seeing decedent circle to build up speed to cross she had "pumped [the brakes] and then held [the brakes]" even before he was on the road. This would have reduced the speed of the truck to much less than 25mph at the moment of impact, which explains why the truck came to a stop so close to the other side of the plant entrance. At such a slower speed the effects of any carry and throw, upon which the defense experts base their theory, would be minimal. It is clear from the record that the gouge in the road is not just in the eastbound lane, but closer to the shoulder of the eastbound lane. The defense experts' calculations are based upon numbers that are either contradicted by the testimony or unsubstantiated by the record. Their theory that the bike was struck in the westbound lane is not sufficiently supported by the record.
Because this sudden emergency was provoked by the decedent, we feel 65% of the fault should be allocated to him. Whereas, defendant driver is 35% at fault because by veering into the lane in which she knew he was trying to cross, she chose a course of action that was somewhat less than reasonable, even taking into consideration she did not provoke the sudden emergency.

DAMAGES
As concerns the issue of damages, the jury awarded $86,151.95, in loss of past support and $241,807.20 in loss of future income and support. As previously stated, this finding of fact is not to be disturbed upon appellate review unless there exists an abuse of discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Upon review of the record, we find there is sufficient support for Professor Boudreaux's testimony and because we find no abuse of discretion, the jury's acceptance of his testimony as a finding of fact cannot be disturbed upon review. The damage findings are thus affirmed.

WORKER'S COMPENSATION
The trial court following La. R.S. 23:1101(B), reduced Liberty Mutual's credit by the same percentage that employee's recovery was reduced by comparative fault. Liberty Mutual, the Intervenor, does not appeal this issue. This ruling is affirmed on appeal, and amended insofar as Ms. Nunez's recovery is reduced by 65%, the amount of fault we allocate to the decedent.
The Intervenor, Liberty Mutual, appeals and argues that the issue of how to apply the intervenor's future credit is *1070 beyond the scope of the trial court's jurisdiction, pursuant to La. R.S. 23:1310.3(E), 23:1101(D) and general rules of construction of the worker's compensation statute. Liberty Mutual alternatively argues, if jurisdiction is found, that the trial court erred in ruling that the future compensation payments should not cease while the credit is taken. Our reasoning for why jurisdiction does not exist follows. Because we find the trial court had no jurisdiction under La. 23:1310.3(E) et seq., the issue of cessation of future payments is not ripe for review.
The grant of jurisdiction over worker's compensation cases and related matters is provided for by statute. Louisiana Revised Statute 23:1310.3(E) provides:
Except as otherwise provided by R.S. 23:1101(D) and 1378(E), the workers' compensation judge shall be vested with original, exclusive jurisdiction over all claims or disputes arising out of this Chapter, including but not limited to workers' compensation insurance coverage disputes, employer demands for recovery for overpayment of benefits, the determination and recognition of employer credits as provided for in this Chapter, and cross-claims between employers or workers' compensation insurers for indemnification or contribution.
According to the statute, there are only two exceptions to the grant of original and exclusive jurisdiction: (1) the ability for a district court to determine whether an intervenor is entitled to a credit as provided by 23:1101(D); and (2) the ability for a court to hear appeals from the board's decisions as provided for in 23:1378(E).
Louisiana Revised Statute 23:1101(D), entitled "employer suits against third persons; effect on right to compensation," provides:
1. Any suit against a third person to recover amounts paid or obligated to be paid under the provisions of this Chapter or any intervention in an action against a third person involving an employee who has received or is receiving benefits under this Chapter seeking reimbursement or credit for benefits paid or obligated to be paid under this Chapter shall be tried before a district court judge only.
2. No suit brought under this Subpart or incidental action seeking reimbursement of amounts paid shall be allowed in a pending action involving a trial before a jury; however, such a suit or incidental action seeking such reimbursement may be tried before the judge involved in the jury trial but outside the presence of the jury.
La. R.S. 23:1101(D)
Our brethren of the Third Circuit dealt with this issue in Broussard, Bolton, Halcomb & Vizzier v. Williams, XXXX-XXXX (La.App. 3 Cir. 10/3/01), 796 So.2d 791. They stated:
In Ellender's Portable Buildings, Inc. v. Cormier, 00-1724, p. 3 (La.App. 3 Cir. 6/6/01); 787 So.2d 601, 603, we stated:
In applying this statute to jurisdiction questions, we have drawn a distinction between those matters which "arise out of the Worker's Compensation Act, rather than merely relate to worker's compensation in general." *795 Covington v. A-Able Roofing, Inc., 95-1126, p. 3 (La.App. 3 Cir. 3/6/96); 670 So.2d 611, 613. If the issue to be considered arises out of the Act, jurisdiction is vested in the OWC; if it merely relates to the workers' compensation claim, the OWC does not have subject matter jurisdiction. Id.

Broussard, supra, at 794-795.
In the instant case, the issue under consideration involves the method for the application of the intervenor's future credit. We consider the application of future credits to be a matter that arises out of the *1071 Worker's Compensation Act, and not merely a question that tangentially relates to worker's compensation in general. Therefore, we find that the district court did not have jurisdiction to rule on this issue, pursuant to La. R.S. 23:1310.3. Accordingly, we reverse and remand so that this matter may be transferred to the worker's compensation judge.

CONCLUSION
We affirm the judgment as amended in part, reverse in part and remand to the Worker's Compensation Judge on the issue of how to apply the future credit.
AFFIRMED IN PART AS AMENDED, REVERSED IN PART AND REMANDED.