896 So.2d 237 (2005)
Jacquelyn JONES, Wife of/and Jack Jones and Vanessa Menendez
v.
Renee HARRIS and Allstate Insurance Company.
No. 2004-CA-0965.
Court of Appeal of Louisiana, Fourth Circuit.
February 2, 2005.
*239 William J. Guste, III, and Patrick G. Kehoe, Jr., New Orleans, LA, for Plaintiffs/Appellees.
Kris P. Kiefer, Nat G. Kiefer, Jr., Kiefer & Kiefer, Metairie, LA, for Defendants/Appellants (Renee Harris and Allstate Insurance Company).
Charles C. Foti, Jr., Attorney General, Sonya E. Hall, Assistant Attorney General, Louisiana Department of Justice Litigation Division, Baton Rouge, LA, for Defendant/Appellant (State of Louisiana/House of Representatives).
(Court composed of Judge PATRICIA RIVET MURRAY, Judge EDWIN A. LOMBARD, Judge ROLAND L. BELSOME).
PATRICIA RIVET MURRAY, Judge.
This is a personal injury action arising out of a motor vehicle accident. From a judgment in favor of the plaintiffs, Jacquelyn Jones, and her husband, Jack Jones, the defendants, Renee Harris, Allstate Insurance Company, and the State House of Representatives, appeal.[1] The central issues Defendants raise on this appeal are whether the accident caused Mrs. Jones' back injury, the necessity of surgical treatment of that injury, the extent of that injury, and the alleged excessiveness of the damages awarded for that injury. For the reasons that follow, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
On June 30, 1998, Mrs. Jones was driving on Canal Street and preparing to turn into the driveway of her place of place of employment, Lafayette Insurance Company, when the rental vehicle she was driving was rear ended by a Jeep driven by Ms. Harris. Mrs. Jones and her co-worker were returning to work from their lunch break. As she was preparing to turn, Mrs. Jones noticed that the driver of the Jeep behind her was bending down. Believing that the Jeep might rear end her vehicle, Mrs. Jones alerted her passenger. According to the deposition testimony of Ms. Harris, she was looking down because the soft drinks she had just purchased from Rally's had spilled. When she looked up a second later, Ms. Harris observed the brake lights of Mrs. Jones' car and attempted to stop, but she was unable to do *240 so. At the time of the accident, Ms. Harris was in the course and scope of her employment with the State.
On February 3, 1999, Mrs. Jones filed suit against Ms. Harris and her insurer, Allstate. Mr. Jones joined in the suit to assert a loss of consortium claim. On November 16, 1999, the Joneses filed an amended petition adding the State as a defendant. The trial court granted the Joneses' motion for summary judgment on liability. Defendants did not contest that decision.
In February 2004, a three-day jury trial was held on the issues of causation and damages. The jury rendered a verdict in Mrs. Jones' favor, assessing her damages as follows:

 Past Medical Expenses $ 154,326
 Future Medical Expenses 80,000
 Loss of Past Wages 80,206
 Loss of Future Wages/ Earning
 Capacity, Including loss of fringe
 benefits 348,864
 General Damages 500,000
 ----------
 Total Damages $ 1,163,396

The jury also awarded $40,000 in loss of consortium damages to Mr. Jones. The trial court rendered judgment in accord with the jury's verdict, but limited the State's liability for the combined general damages award to Mrs. Jones (general damages of $500,000) and Mr. Jones (loss of consortium of $40,000) to $500,000 pursuant to La. R.S. 13:5106(B). The trial court denied the State's motions for judgment notwithstanding the verdict and new trial. This appeal followed.

DISCUSSION
On appeal, Defendants challenge four of the jury's awards; to-wit: (1) general damages; (2) loss of past wages; (3) loss of future wages/earnings capacity, including fringe benefits; and (4) loss of consortium. We separately address each award.

GENERAL DAMAGES
The jury awarded Mrs. Jones $500,000 in general damages. Defendants argue that this award is clearly excessive. In support, Defendants rely solely on Chapman v. Regional Transit Authority/TSMEL, 95-2620 (La.App. 4 Cir. 10/2/96), 681 So.2d 1301. In Chapman, this court affirmed a jury award of $370,000 to a forty-two year old woman for a similar type of back injury, i.e., an operated herniated disc.
When, as here, the trier of fact (in this case, the jury) has made a general damage award and the defendants are contending that award is excessive, the "much discretion" standard applies. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). The rationale behind the application of the much discretion standard is that "awards of general damages, at least as to the amount awarded for injuries proved to have been caused by the tort, cannot be calculated with mathematical certainty." Guillory v. Insurance Co. of North America, 96-1084, p. 1 (La.4/8/97), 692 So.2d 1029, 1036 (Lemmon, J., concurring)(citing Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968)). This rationale is codified in both La. C.C. art.1999, which provides that "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages," and La.C.C. art. 2324.1, which provides that "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury."
An appellate court's initial inquiry in reviewing a general damage award is whether the particular effects of the particular injuries on the particular plaintiff are such that there has been an abuse of the much discretion vested in the trier of fact (judge or jury). Youn, 623 So.2d at *241 1260. Because "[r]easonable persons frequently disagree about the measure of general damages in a particular case," a general damage award may be disturbed on appeal only when "the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." Youn, 623 So.2d at 1261. The jurisprudential theme that has emerged is that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Id.
Although Defendants invite us to resort to a consideration of awards for generically similar injuries and contend that the award in this case is disproportionate to such prior awards, the jurisprudence is settled that "resort to prior awards is only appropriate after an appellate court has concluded that an `abuse of discretion' has occurred." Cone v. National Emergency Services, Inc., 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089. Because we find no abuse of discretion, a comparison of prior awards is not appropriate. Instead, we focus our analysis of the effects of this particular injury on this particular plaintiff under the particular circumstances of this case.
Our review of the record shows that upon the impact of the accident, Mrs. Jones testified that she was thrown forward and the seatbelt jerked her back and locked her into the seat. That night she experienced stiffness in her neck and lower back for which she took Motrin. During the next nine days she continued taking over-the-counter medication for the escalating pain in her left leg and lower back. On referral by a long time friend (who also is her attorney), she sought treatment with Dr. L.S. Kewalramani.[2]
On July 9, 1998, Dr. Kewalramani first saw Mrs. Jones.[3] On the first visit, Mrs. Jones complained of pain in the lower back, the left buttock, the left shoulder, and the neck region. She gave a history indicating that she was forty-four years old and that she was in good health until June 30, 1998, when she was in a motor vehicle accident.[4] She reported that the accident occurred on a Tuesday, that she returned to work on Wednesday and Thursday, and that she has been on vacation since then. During the nine-day period between the date of the accident and the date she first saw Dr. Kewalramani, she reported that she took Motrin, but her pain continued and gradually increased in severity.
Dr. Kewalramani testified that his initial examination of Mrs. Jones revealed mild spasms in her neck and back and localized tenderness at the L5-S1 level. He further testified that his initial impression of what the accident did to Mrs. Jones' neck and lower back was as follows:
[T]he patient's neck pain was originating at the level of muscular ligamentous structures in the neck. Her left shoulder complaints were more in keeping with the rotator cuff strain on the left side. Her lower back pain or lumbar pain of muscular ligamentous trauma, *242 the pain originating at the level of muscles in the ligaments. And I thought that because there was tenderness at the left sacroiliac joint, I said there was sacroiliac strain.
On the first visit, Dr. Kewalramani advised Mrs. Jones to get x-rays of the cervical spine, lumbar spine, and hip joints. He also prescribed a theragesic cream and other medication.
On her next visit, Dr. Kewalramani gave her a home physical therapy program to follow. He also interpreted the x-rays of her lumbar spine, which were taken on July 21, 1998, as showing spurring and sclerosis, which he characterized as ordinary wear and tear (degenerative changes). He further interpreted the x-rays as showing a mild reduction of the intervertebral disc at the L5-S1 level and retroluxation of the L5-S1 by two to three millimeters. Retroluxation, he explained, referred to the fact that the L5 vertebrae was backwards in relation to the S1.[5] He testified that retroluxation is something that is not normally seen and that it was most likely of post-traumatic origin. He further testified that the retroluxation is an element of instability. He still further testified that the x-rays confirmed his initial impression regarding the L5-S1 level being the problem area.
For the next several months, Dr. Kewalramani continued to treat Mrs. Jones conservatively. On each visit, she showed signs of improvement. At the January 14, 1999 visit, Dr. Kewalramani discharged her with the recommendation that she continue with the home physical therapy program. He gave her a prescription for a small amount of medication and instructed her to call his office if she experienced any exacerbation of pain.
Ten months later, on November 12, 1999, Mrs. Jones returned to Dr. Kewalramani complaining of progressively increasing lumbar pain and discomfort radiating along the left lower extremity. According to Dr. Kewalramani's report, Mrs. Jones told him that she was hoping the pain would improve with time, that her husband was calling her crippled, that she was concerned because she was experiencing radiating pain down her right leg, and that she could not live without the medication. Dr. Kewalramani testified that she denied having any new injury or trauma. Based on her complaints, Dr. Kewalramani ordered an EMG and nerve conduction study.
The nerve conduction study results were normal, but the EMG revealed abnormal potentials in the muscles supplied by the L5-S1 nerve roots as well as abnormalities in the leg muscles. Because of the abnormal EMG findings, Dr. Kewalramani ordered an MRI, which was done on March 20, 2000. The MRI, like the EMG and x-rays, showed a problem at the L5-S1 level. Based on the abnormal EMG and MRI results coupled with the fact that he had treated her conservatively for a lengthy period over which she had progressed and then regressed, Dr. Kewalramani recommended that Mrs. Jones get a second opinion from a neurosurgeon of her choice. She selected Dr. Kenneth Vogel.[6]
On May 22, 2000, Dr. Vogel testified that he first saw Mrs. Jones on the recommendation of Dr. Kewalramani. According to Dr. Vogel, Mrs. Jones complaints on the first visit were low back pain without radiation. She provided him with a history *243 of being in good health until June 30, 1998, when she was involved in a motor vehicle accident. She denied any prior injuries. She informed him that she was thrown about in the accident and noted the onset of lumbosacal and left leg pain forty-eight hours later. She further informed him that Dr. Kewalramani had treated her conservatively and that she had a lumbar MRI and an EMG. She still further informed him that after the accident she had returned to her normal work duties as an insurance underwriter.
Dr. Vogel testified that his neurological examination of the lower back region revealed a minimal degree of limitation of motion with focal spasm bilaterally. Dr. Vogel testified that he reviewed the March 20, 2000 MRI and interpreted it as showing a disc protrusion with degeneration at the L5-S1 level, which he noted is called a "Modic 2A disc herniation." Dr. Vogel's initial impression after reviewing the films, taking a history, and conducting a physical examination was that Mrs. Jones had either a herniated disc or a lumbar degenerative disc disease, which is commonly called symptomatic lumbar degenerative disc disease.
Dr. Vogel recommended to Mrs. Jones that she undergo a micro-surgical diskectomy. He informed her that that this surgery has a 90 to 95% success rate and that a successful surgery is one that resolves 80 to 90% of the pain. Stated otherwise, under the best circumstances, she was told that she would have 10 to 20% pain residual. Mrs. Jones was hesitant to have the surgery. On June 28, 2000, she returned to Dr. Kewalramani and informed him that she was "thinking about" having the surgery; he recommended that she consider it. After discussing it with her husband, she ultimately decided to have the surgery.
Before the surgery, Dr. Vogel ordered that she have two additional test performed: a lumbar diskogram and a CT scan. These two tests were done in the hospital on April 3, 2001, which was the day before her surgery. At trial, Dr. Kewalramani reviewed the result of those two tests and testified that they showed a ruptured disc at the L5-S1 level and confirmed that this was the pain generator. Both Dr. Kewalramani and Dr. Vogel testified that those two tests were consistent with the three prior tests (the x-rays, EMG, and MRI) and that all five tests provided proof of a disc herniation at L5-S1.
On April 4, 2001, Mrs. Jones underwent a microsurgical laminectomy, L5-S1, left; lumbar medial branch neurotomy, L4-5 and L5-S1, left and a lumbar epidural block. In his operating report, Dr. Vogel stated that he was able to see through the microscope that the disc herniation at L5-S1 had actually occurred.
On May 23, 2001, Mrs. Jones returned to Dr. Kewalramani with a prescription from Dr. Vogel for physical therapy treatment. On that visit, she reported definite improvement in her lumbar pain and its radiation. On June 19, 2001, she again saw Dr. Kewalramani and reported that physical activities increased her discomfort. Dr. Kewalramani's impression on that visit was that she continued to improve.
On June 26, 2001, Dr. Vogel discharged her from active care and instructed her to return on an "as needed" basis and that she would reach maximum medical improvement one year after the surgery or in April 2002. He advised her to continue following conservative care, including home and supervised physical therapy treatment. He found Mrs. Jones had a 10 to 15% medical impairment of the body as a whole and imposed the following permanent functional restrictions on her: to avoid those activities which require her to *244 lift, push or pull greater than 35 pounds, or to bend repeatedly. Finally, he advised her that she may return to work on July 17, 2001.[7]
On August 27, 2001, she saw Dr. Kewalramani. On this visit, she reported that her lumbar pain was aggravated by sitting in one position, being on her feet, bending, and stooping. She denied engaging in any heavy lifting, pushing, or pulling activities. Dr. Kewalramani's impression was that she continued to be symptomatic and that her complaints of pain radiating along the left lower extremity needed to be evaluated. He thus ordered a second MRI, EMG, and nerve conduction study.
The second MRI, which was done on November 1, 2001, revealed at the L5-S1 level either scar tissue or disc protrusion on the left side. Whether or not this was a recurrent herniation or scar tissue could not be determined; rather, Dr. Kewalramani testified that a repeat MRI with contrast was needed to make this determination. Although he believed that Dr. Vogel subsequently had ordered a repeat MRI, he testified that he never saw the results. The second EMG, which was performed on November 30, 2001, revealed "S1 involvement predominantly." The nerve conduction study, which was performed on that same date, showed the L5-S1 nerve roots were conducting slower than normal. These three tests, Dr. Kewalramani testified, revealed that Mrs. Jones still had a significant problem at L5-S1. In his report, Dr. Kewalramani noted that the abnormalities revealed on the tests were consistent with lumbar radiculopathy. He prescribed folic acid and weekly B-12 injections and recommended that she return to see Dr. Vogel. Mrs. Jones, however, did not return to see Dr. Vogel until several months later. In the interim, she continued to treat with Dr. Kewalramani, who continued to find her symptomatic.
On September 23, 2002, Mrs. Jones returned to see Dr. Vogel. At that visit, she reported that two days earlier she had experienced spontaneous exacerbation, which means her back pain and left leg pain simply reoccurred without any associated trauma. Her complaints at that visit were lumbosacral pain, left leg pain, and mild shoulder pain. Dr. Vogel's impression was that she had recurrent herniated lumbar disc with possible lumbar instability suspected. Dr. Vogel's opinion was that she fell into the category of the 5 to 10% of patients who after the first surgery have complications and require additional treatment.
On February 3, 2003, Dr. Vogel again saw Mrs. Jones. On this visit, he recommended that she undergo a posterior lumbar cage fusion, which he characterized as a much bigger surgery. He advised her that this surgery has a lower success rate than the first one (only 90%), and that, like the first surgery, a successful surgery would resolve only 80 to 90% of the pain. She was told that even if the second surgery was a success, she would have a residual pain of 10 to 20%.
On March 19, 2003, Mrs. Jones underwent the following multiple operative procedures: an intradiscal electrothermal annuloplasty, posterior lumbar interbody cage fusion, microsurgical diskectomy, L5-S1, bilateral, medial branch neurotomy, L4-L5 and L5-S1, bilateral and lumbosacral epidural block. According to Dr. *245 Vogel's testimony, the second surgery confirmed that she had a recurrent disc herniation. In his operating report, Dr. Vogel stated that he found the herniation was encroaching on the S4 nerve root, which is considered grossly abnormal.
On May 16, 2003, Mrs. Jones returned to Dr. Kewalramani with a prescription from Dr. Vogel for physical therapy treatment. On June 17, 2003, Dr. Vogel dismissed Mrs. Jones from his active care. At that time, Dr. Vogel found she was progressing satisfactorily and that the second surgery appeared to be a success. Dr. Vogel placed her on permanent partial disability and rated her disability as 15 to 20%. He advised that she would reach maximum medical improvement approximately two years after the operation or in March 2005. At that time, he advised that she would have the following permanent functional restrictions: avoiding activities requiring her to lift, push, or pull more than 35 pounds or to bend repeatedly. Dr. Vogel further testified that because she had not yet reached maximum medical improvement, it was premature to say if she would be able to return to work. He still further testified that because of the fusion at the L5-S1 level, there was added stress placed on the disc above that level. For that reason, he noted that she was more susceptible to re-injury and needed to continue conservative treatment.
On the next day, June 18, 2003, Mrs. Jones returned to see Dr. Kewalramani. At the time of trial, she was still seeing Dr. Kewalramani. He testified that he last saw her before trial on January 12, 2004, and at that time she continued to be symptomatic. He assigned her a 15 to 20% partial permanent impairment of the body as a whole. He placed the following permanent functional restrictions on her: to avoid repeated bending, stooping, continuous sitting or standing. He placed a thirty-five (preferably twenty-five) pound weight limitation on her. For trial purposes, Dr. Kewalramani prepared a life care plan reflecting what her future medical care needs will be.[8] Dr. Kewalramani testified that his final diagnoses are: "chronic lumbar muscular ligamentous pain syndrome; lumbar mechanical dysfunction; disc dysfunction at L5-S1; lumbar radiculopathy; the status post-operatively, lumbar misrosurgical diskectomy and medial branch neurotomy. And the last operation was lumbar discectomy and bilateral medial branch neurotomy and cage fusion."
At the State's request, Dr. Walter Abbott saw Mrs. Jones on January 21, 2004. Dr. Abbott testified by deposition that Mrs. Jones' medical condition on that date was low back pain and some degree of referred pain into the left and right side. Her chief complaints were pain in the left lower back. Although she also complained of right shoulder pain, he testified that she identified her real problem as her back pain. She also complained that she could not walk more than three blocks without having inner thigh pain. Based on his review of the MRIs and other tests and her prior diagnosis, Dr. Abbott testified that it was his opinion that surgery was not necessary. In his report, Dr. Abbott opined that the initial MRI showed Mrs. Jones' back injury to be a "minimal problem" and did not show a disc herniation but rather a degenerative disc at L5-S1. Dr. Abbott testified that there was a definite change in her condition for the worse after surgery and that "surgery is not without trauma." As to causation, he attributed *246 her back pain not to the accident, but to the surgeries. As to her future prognosis, he testified that he did not believe there would be much improvement and that she is "probably pretty much stuck with what she has," which he defined as "fatal back syndrome," a "failed effort to treat a very minor problem."
Dr. Abbott's testimony that the back surgeries should not have been performed and that Mrs. Jones' back pain is attributable to those surgeries presented a causation issue. A plaintiff in a tort case has the burden of proving by a preponderance of the evidence that the accident more probably than not caused the claimed disabling condition. Jones v. Peyton Place, Inc., 95-0574, p. 12 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 763. This burden is satisfied if medical evidence is presented establishing that it is more probable than not that the claimed condition was caused by the accident. 95-0574 at p. 13, 675 So.2d at 763.
Both of Mrs. Jones' treating physicians, Dr. Vogel and Dr. Kewalrami, opined that more probably than not her back injuries were related to the accident. Addressing causation, Dr. Vogel acknowledged that he made a notation in Mrs. Jones' record that he felt in all probability her signs and symptoms were causally related to the June 30, 1998 incident. As to causation, Dr. Kewalrami opined that the accident caused instability in her low back, disc herniation, and permanent pain. He further testified that because of this particular injury, Mrs. Jones will continue to live with low back and leg pain for the rest of her life. Moreover, Dr. Vogel was expressly questioned regarding Dr. Abbott's opinion that surgery should not be performed unless there is nerve root pressure, instability, or leg pain. Dr. Vogel responded that he agreed with Dr. Abbott's opinion regarding when back surgery is justified. However, contrary to Dr. Abbott's opinion regarding Mrs. Jones' pre-operative condition, Dr. Vogel testified that, in his opinion, the tests results supported a finding of a herniated disc at the L5-S1 level. Moreover, Dr. Vogel testified that Mrs. Jones had both instability and leg pain before the first surgery. The jury apparently made a credibility determination that the surgeries were warranted and that Mrs. Jones' back pain was caused by the accident.
Credibility determinations, including evaluating expert witness testimony, are for the trier of fact. Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201, p. 6 (La.10/19/99), 748 So.2d 417, 421. Such credibility determinations are factual findings governed by the well-settled manifest error standard of review. Simply stated, "the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Given that both Dr. Vogel and Dr. Kewalrami, Mrs. Jones' treating physicians, related Mrs. Jones' back injury to the accident, we cannot say the jury was manifestly erroneous in resolving this conflicting expert testimony in Mrs. Jones' favor.
Returning to the issue of whether the general damage award was excessive, we note that general damages may be established in three ways: (i) the circumstances of the case, (ii) expert medical testimony, and (iii) the tort victim's testimony. Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 7-2(c)(1996). In this case, Mrs. Jones' evidence on this *247 issue consisted primarily of her own testimony and that of her two treating physicians. The circumstances of the rear-end collision were undisputed and were not especially significant.
Both of Mrs. Jones' treating physicians testified that there were five objective tests that they believed established her lower back injury at the L5-S1 level. They both opined that her back injury was more probably than not caused by the June 30, 1998 accident. Dr. Kewalrami testified that he has treated Mrs. Jones for a period of five and a half years and that during that period he saw her on forty-one separate occasions. Although he attempted to treat her conservatively for a lengthy period of time, she ultimately was referred to a neurosurgeon, Dr. Vogel, and underwent two surgeries. Despite the surgeries, she continues to be symptomatic.
Mrs. Jones testified that she presently still has pain. She testified that she presently is aggravated because she lost her job after the first surgery. She explained that she was under the impression that she would be able to return to her job as an insurance underwriter at Lafayette Insurance after the first surgery. Although she continued working until immediately before her first surgery (March 31, 2001 was her last day of work), she lost her job when she was unable to return to work for over twelve weeks following the first surgery. She explained that Lafayette Insurance has a policy that if an employee is not back to work in twelve weeks, it has the right to replace that employee. Mrs. Jones testified that she felt the application of the policy to her was unfair as she had worked for the company for twenty-five years. She further testified that she called Lafayette Insurance after the first surgery, but was told that no job was available.
Mrs. Jones still further testified that she did not believe she could work because she has a problem getting up out of bed in the morning. She testified that she has to get up before her husband leaves for work so that he is there to assist her. She described her daily activities as including doing her home physical therapy program. She stressed her inability to sit or lay down for a lengthy period. She testified that she has two back braces and that she sleeps in one of them and sometimes wakes up at 4:00 a.m. with pain. She testified that they had to install both a handicapped toilet and a shower in their house for her. As to the need for the latter, she noted that on one occasion she was stuck in the tub for forty-five minutes.
Mrs. Jones characterized herself as an active person before the accident. She listed the activities she previously enjoyed doing as including shooting pool, going out dancing, and bowling. Since the accident she testified she is no longer able to do these activities. Another activity that she identified as impaired due to the accident is her ability to engage in activities with her grandchildren, such as lifting them.
Considering the particular effects of the particular injuries on this particular plaintiff coupled with the great discretion accorded the jury's decision on damages, we cannot say that the jury's award of $500,000 to Mrs. Jones for her pain and suffering was an abuse of discretion.

LOSS OF PAST WAGES
Unlike general damages, loss of past wages are susceptible of mathematical calculation, and thus this award is not subject to the much discretion standard of review. Reichert v. Bertucci, 96-1213, p. 5 (La.App. 4 Cir. 12/4/96), 684 So.2d 1041, 1044-45. To recover loss of past wages, the plaintiff must prove the time missed from work as a result of the injury. Id. *248 An analysis of an award for past wages of a salaried employee is generally a straightforward mathematical calculation. Such is the case here.
It is undisputed that Mrs. Jones continued working at her job at Lafayette Insurance until shortly before her first surgery. As noted, her last day of work was March 31, 2001, and the first surgery was performed on April 4, 2001. The straightforward calculation of her past loss of wages is thus her income at the time of the accident times the time elapsed between her last day of work and the date of trial.
Both sides presented economic expert testimony on this issue. The experts for both sides calculated Mrs. Jones' loss of past wages based on the same wage base of $29,072 per year, which is the amount she was earning at the time of the accident. The experts differed only in the period over which they made their calculations. The Jones' expert, Shael Wolfson, based his calculations on the period beginning May 1, 2001, through the date of trial, and arrived at a figure of $80,206. Mr. Wolfson selected May 1st because Mrs. Jones was paid through April 30, 2001. The State's expert, Dan Cliffe, based his calculations on the period beginning March 31, 2001, through the date of trial, and arrived at a figure of $82,530. Mr. Cliffe selected March 31st because that was the last date she actually worked. The jury selected Mr. Wolfson's lower figure of $80,206.
Challenging the jury's award of $80,206, Defendants contend that the medical evidence does not support this award. They emphasize Dr. Vogel's testimony that Mrs. Jones could return to work following the first surgery on July 17, 2001. Mrs. Jones' testified that she did not return to work because her job was no longer available. Defendants contend that this does not entitle her to loss wages. They further note that there was no evidence that Mrs. Jones attempted to seek other employment.
The Joneses counter that there were a number of reasonable inferences the jury could have drawn from the evidence on this issue. They cite the testimony of their vocational rehabilitation expert, Bobby Roberts, (which is discussed in detail below) that Mrs. Jones was educationally, physically, and competitively incapable of returning to employment in the future (i.e., post-trial). The Joneses contend that those same reasons support a finding that she was just as incapable of returning to work following her two surgeries. Indeed, they stress that at the time of trial she had not been released to return to work from the second surgery. They further stress Defendants' failure to establish that any job was available for her. Finally, the Joneses emphasize that the jury awarded the exact amount that Mr. Wolfson, their expert, calculated for loss of past wages, $80,206. The Joneses thus contend that this award was not erroneous. We agree.

LOSS OF FUTURE WAGES/EARNING CAPACITY, INCLUDING LOSS OF FRINGE BENEFITS
Unlike loss of past wages, which is a form of special damages, loss of future wages (also termed impairment of earning capacity) has elements of both general and special damages. Louisiana Tort Law, supra at § 7-2. Like general damage awards, loss of future wages awards are "inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty." Myers v. Burger King Corp., 92-0400, 93-1626, p. 14 (La.App. 4 Cir. 5/26/94), 638 So.2d 369, 379. Like special damages, to recovery loss of future wages the plaintiff is required to present medical evidence indicating *249 the presence of at least a residual disability causally related to the accident. Id.
At trial, both the Joneses and the State presented vocational rehabilitation experts on this issue. The experts agreed that their educational testing revealed a discrepancy between Mrs. Jones' test scores and her achieved grade level. Although she was a high school graduate, their testing revealed that she was at approximately the seventh or eighth grade level. The major disagreement between the experts was over Mrs. Jones' present ability to return to work. Mr. Roberts, the Joneses' expert, testified that he conducted extensive physical capacity and functional ability testing of Mrs. Jones. Based on that testing, he opined, as noted above, that she was educationally, physically, and competitively incapable of returning to either full or part time employment. He explained that she is not going to be able to go to work eight hours a day, forty hours a week. Addressing the fact that Mrs. Jones was not yet at maximum medical improvement when he tested her, Mr. Roberts testified that he would expect her scores to be even lower if he tested her when she reached that point, i.e., when she is fifty-two years old. As to her ability to return to her job as an underwriter, Mr. Roberts testified that she did not satisfy the requirements for basic sedentary performance. He stressed that she was incapable of sustaining the daily activity required in a workday that would be considered competitive and for which she would be paid a salary. He further testified that she is at a competitive disadvantage in that she was let go from the job at which she worked for twenty-five years. As to the latter point, he emphasizes that, given her present level of disability, common sense indicates that she is not going to be able to secure a similar job in today's competitive job market.
In stark contrast, Barney Hedgeworth, the State's expert, opined that Mrs. Jones is capable of gainful employment at the sedentary to light physical demand level and that "she should be capable of returning to her usual and customary occupation as an associate underwriter." In so opining, he relied heavily on her steady, past employment record, which demonstrated her ability to work at a skilled level job.
Given the lump sum award for future loss of wages/earnings capacity, including loss of fringe benefits of $348,846, the jury obviously resolved the conflicting expert testimony on the issue of Mrs. Jones' current ability to return to work in her favor. We cannot say that factual finding was manifestly erroneous.
As noted above, both sides also presented expert economic testimony. The primary difference in the experts' calculations of Mrs. Jones' loss of future wages was with regard to the number of years that Mrs. Jones would have continued to work.[9] The State's expert, Mr. Cliffe, based his calculation on statistical data establishing that women who are 44.7 years oldMrs. Jones' age on the date of the accidenttend to work only an additional 13.05 years. Since 5.6 years elapsed between the date of the accident and the date of trial, Mr. Cliffe based his calculation on the assumption that Mrs. Jones would only work another 7.46 years post-trial. When questioned about Mrs. Jones' testimony that she intended to work until she was sixty-five years old, Mr. Cliffe's response was that "[t]here's a big difference between *250 wanting to work and being in a position to work."
In contrast, the Joneses' expert, Mr. Wolfson, based his calculations on the assumption that Mrs. Jones would work until she was sixty-six years old, which is the Social Security retirement age for someone who was born in the same year that Mrs. Jones was born. Due to the vast difference in the number of years over which the experts based their calculations, their future loss of wages figures varied substantially. Mr. Wolfson's figure was $391,799 (plus an additional $48,622 for fringe benefits); whereas, Mr. Cliffe's figure was $210,660. The jury's lump sum award of $348,846 was between those two figures.
Significantly, as the Joneses stress, the jury verdict form contained only one line labeled future loss of wages/earning capacity, including fringe benefits. Because the jury's lump sum award was less than the figure Mr. Wolfson calculated for future loss of wages alone (he calculated an additional $48,622 for loss of fringe benefits), the Joneses stress the impossibility of determining whether or not the jury's award included any amount for loss of fringe benefits. We agree.[10] Given that impossibility, we find it appropriate to view the lump sum award as one solely for loss of future wages.
In determining a proper future lost wage award, factors to be considered are: "the plaintiff's physical condition before the injury, the plaintiff's past work history and work consistency, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life." Myers, 92-0400 at pp. 14-15, 638 So.2d at 379. Applying those factors here, Mrs. Jones' physical condition before the injury was good. She had a stable, consistent work history; for twenty-five years she worked for the same employer, Lafayette Insurance. At the time of the accident, her yearly income was roughly $29,000. Mrs. Jones testified that she planned to continue working at her job until she was sixty-five years old so that she could get collect full company benefits. Given these facts, we cannot say the jury abused its discretion in awarding $348,864 for loss of future wages.

LOSS OF CONSORTIUM
The jury awarded Mr. Jones $40,000 for loss of consortium. Loss of consortium is a type of general damages, and, for that reason, the trier of fact (in this case the jury) has much discretion in assessing loss of consortium damages. Etheredge v. St. Paul Mercury Ins. Co., 35,832, p. 5 (La.App. 2 Cir. 4/3/02), 814 So.2d 119, 123. The jurisprudence has recognized the following elements of loss of consortium damages: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material *251 services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Id. A plaintiff is not required to prove every element to support an award of loss of consortium.
At the time of trial, the Joneses had been married for twenty-five years. Mr. Jones, who was sixty-six years old, was planning to retire from his state job as a milk and dairy inspector, which he had held for thirty-seven years. However, he testified that he had to delay his retirement due to his wife's inability to return to work after her first surgery. Before the accident, Mrs. Jones did the housework. After the accident, Mr. Jones testified that he had to help with the housework both inside and outside. Because his wife has trouble getting on and off the toilet  it was too low for her given her back pain  he testified that they had to install a handicapped toilet in the house.
When asked about the activities he and his wife enjoyed before the accident, Mr. Jones replied that they enjoyed going for walks. Specifically, he testified that they would go for walks downtown and at the Riverwalk. He testified that since the accident his wife has "slowly backed away from walking." He further replied that before the accident his wife would help with cooking and barbecuing for the family, but since the accident she is unable to do so.
Lastly, when asked whether their intimacy has been affected by the accident, Mr. Jones replied that it has been affected, that it has gotten "really bad," and that he has learned to live with it. Given these facts, we cannot say the jury abused its discretion in awarding Mr. Jones $40,000 for loss of consortium. See Runnels v. Esteves, 550 So.2d 1225 (La.App. 4 Cir.1989)(affirming $45,000 award for loss of consortium).

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] For ease of discussion, the State House of Representatives is referred to as the "State," and the three defendants  Ms. Harris, Allstate, and the State  collectively are referred to as "Defendants."
[2] Although the transcript spells the doctor's name as "Dr. Kewarlamani," the doctor's own records spells his name as "Dr. Kewalramani." We thus use the latter spelling.
[3] At trial, Dr. Kewalramani was qualified as an expert in the fields of physical medicine and rehabilitation, electro diagnostic medicine and pain management.
[4] Mrs. Jones past medical records from her family doctor, Dr. Clanton, from 1990 to 1998, reflect that she had no prior complaints of lower back pain or left or right leg pain. Her only prior complaint of neck pain related to a sinus infection.
[5] The prefix "retro" means in the back, and the term "luxation" means "dislocation, a condition where a bone is displaced from its normal position." P.H. Collin, Dictionary of Medicine (3rd ed.2000).
[6] At trial, Dr. Vogel was qualified as an expert in the field of neourosurgery.
[7] As discussed elsewhere, her employer, Lafayette Insurance, had a policy that they would not keep the job of an employee who failed to return to work for over twelve weeks. Pursuant to that policy, Lafayette Insurance gave Mrs. Jones' job away when she failed to return to work for over twelve weeks following the first surgery. In July 2001, Mrs. Jones thus no longer had a job to which she could return.
[8] Defendants do not dispute the jury's award of $80,000 for future medical expenses. We thus do not address these.
[9] Both experts agreed upon the appropriate discount rate to calculate the present value of Mrs. Jones' loss of future wages, i.e., about five percent.
[10] Nonetheless, we note that the Joneses' expert, Mr. Wolfson, testified he calculated the present value of Mrs. Jones' loss of fringe benefits to be $48,622 based on the assumption that an employer contribution factor of 12.41% applied. He testified that he obtained that factor from government data. The State's expert, Mr. Cliffe, made no calculation of the amount of loss of fringe benefits; he explained that he was not provided any information regarding what Mrs. Jones fringe benefits may have been. The record reflects that the only evidence of Mrs. Jones' fringe benefits was that her pay stubs reflected deductions for dental and life insurance, that she was a participant in a 401K plan and an employee stock ownership plan, and that she received a bonus in 1995 and 1996 in the amount of 7% of her salary. For the reason noted in the opinion, we find it unnecessary to decide if the jury actually made any award for loss of fringe benefits.