DAVID S. GORBATY, Judge.
 

 |! Plaintiff Robert Cronin appeals a judgment of the trial court which found him 100% liable for injuries he sustained while exiting a building owned by defendant St. Bernard Port, Harbor and Terminal District. For the following reasons, we reverse and render.
 

 FACTS AND PROCEDURAL HISTORY:
 

 Robert Cronin was injured as he exited a building owned by the St. Bernard Port, Harbor and Terminal District (hereinafter “the Port”). He sustained cuts to his fore
 
 *48
 
 head, left arm, and nostril when the plate glass in a door broke and fell on him.
 

 Suit was originally filed against the Department of Public Safety and Corrections, Office of Motor Vehicles (hereinafter “OMV”) and the Port by Mr. Cronin and his wife, Michelle; however, the OMV was dismissed from the suit on summary judgment, and Michelle Cronin was voluntarily dismissed as a plaintiff.
 
 [1]
 

 ^Following a bench trial and the submission of post-trial memoranda, the trial court rendered judgment finding that “the Plaintiff was leaving the Port building in an agitated state and did not exercise the care and self control of the average reasonable man, which led to his own injury.”
 

 This appeal followed. The Port answered the appeal seeking to recover its costs incurred in the litigation.
 

 STANDARD OF REVIEW:
 

 Our review of the trial court’s findings in the present case is subject to the manifest error rule. It is well settled that an appellate court may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Cole v. State Department of Public Safety & Corrections,
 
 01-2123, p. 14 (La.9/4/02), 825 So.2d 1134, 1144,
 
 citing Stobart v. State through Dept. of Transp. and Dev.,
 
 617 So.2d 880 (La.1993).
 

 Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989). When the findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of fact, for only the fact finder is cognizant of the variations in demeanor and tone of |svoice that bear so heavily on the listener’s understanding and belief in what is said.
 
 Id.
 
 Where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.
 
 Id.
 
 at 845.
 

 Application of the manifest error standard of review does not mandate an af-firmance of a lower court decision with respect to findings of fact. Where an appellate court finds manifest error, the factual findings of the trier of fact may be reversed.
 
 Alexander v. Pellerin Marble & Granite,
 
 93-1698 (La.1/14/94), 630 So.2d 706, 710.
 

 ASSIGNMENT OF ERROR NO. 1:
 

 Mr. Cronin argues that the trial court erred in not finding in his favor because the trial court relied on the contradictory, biased and inconsistent deposition testimony of Ernest Labat, who did not testify at trial. We agree.
 

 The only evidence introduced at trial that Mr. Cronin was out of control as he left the Port’s building was that of Ernest Labat, a Port employee, via pre-trial deposition testimony.
 
 [2]
 
 Mr. Labat was never
 
 *49
 
 listed on any incident report, nor was his presence at the scene even disclosed until almost four years after the incident. No one at the scene recalls him being there, including the OMV employees who testified that they left their office and looked down the very hallway Mr. Labat 14claims to have been standing in. Mr. Labat’s testimony was fraught with conflicting versions of how he happened to be in the building, whether he “locked” the door involved in the accident after bringing in his supplies, and whether the door to the office where he was working was open or closed.
 

 Mr. Labat explained that he was in the building preparing to paint an office on the date of the accident. He was adamant that the set of two side-by-side doors in question were key-locked every night after hours; however, Mr. MeCaskell, the OMV employee who had worked in the building since 1994, testified that the doors were left unlocked due to their close proximity to the guard shack. Mr. Labat was equally adamant that he had unlocked the right side door as one exited the building to place his equipment in the building, and that the door was working perfectly. He was sure that he had relocked the door when he was finished. Mr. Labat claimed that he heard Mr. Cronin “huffing and puffing” as he came down the hallway. He stated that he saw Mr. Cronin as he “went kind of over the little bar railing” and “went through” the glass of the locked door. He reiterated upon questioning that “he [Mr. Cronin] hit that bar and busted the glass out.”
 

 Mr. Labat claimed to have been standing in the doorway as Mr. Cronin passed; however, on cross-examination, he stated that he had closed the door to the office where he was working taping walls in preparation to paint. He also said that he closed the door of the office to prevent dust from going into the hallway. Mr. Labat stated that he did not go to Mr. Cronin’s aid because other people were taking care of him. Mr. Labat was told by his supervisor, Buddy Lagman, to get |fisome water to clean up the blood. He testified that three or four people from the OMV office came out to the scene. No one took a statement from him at that time, although he testified that he spoke to his supervisor about what he had seen. When asked on cross-examination if he talked to anyone from the Port at the time, he responded “Well, it always on that accident deal, no matter who it involves, I talked to Drew [the assistant director of the Port] and I talked to Bobby Scafidel [the executive director of the Port].”
 

 David MeCaskell, a motor vehicle compliance analyst supervisor employed by the OMV who worked in the building since 1994, testified contrary to Mr. Labat that the doorway involved in the accident was never key locked for security at any time of day because the set of doors was near the guard shack. Mr. MeCaskell testified that he had reported as early as 1994 to both the secretary in the Port office and the security supervisor, John Cantrelle, that the door was broken. Although he remembers seeing various people working on the door, the problem with the door sticking was never corrected. Mr. McCas-kell claimed that he was the person who had locked the right hand door with the pins, and that the Port was aware of it. No signs were ever placed on the door to indicate that it was locked. Mr. MeCaskell testified that he did not see the accident, but heard the glass crash. He went into the hallway, saw Mr. Cronin bleeding, returned to his office and called the Port. He was told that 911 had already been notified; he did not go out to assist Mr. Cronin.
 

 
 *50
 
 IfiPam Lanier, the OMV employee who assisted Mr. Cronin, testified that Mr. Cronin had earlier that morning passed a test for a chauffeur license, but was not issued the license because of blocks placed by the State, and was instructed to go to her office to get it cleared. Mr. Cronin signed the log, and waited slightly more than an hour before being assisted. She explained to him that the two blocks on his license were for his vehicles being uninsured, but that the blocks could be removed if Mr. Cronin either provided proof that the vehicles were insured on the dates they left his ownership, or if he could not provide such proof, paid a fine. Mr. Cronin left the office to return home to get the necessary paperwork for the vehicles.
 

 Ms. Lanier testified that Mr. Cronin was not happy with the prospect of paying a fine, but she stated he remained claim and polite throughout their meeting. She testified the Mr. Cronin did not cause any trouble, and she did not hear him cursing or yelling after he left her desk. A few minutes later, however, she heard a crash in the hallway, went out to look, and saw Mr. Cronin. She did not go down the hallway to offer assistance.
 

 Mr. Cronin testified that there were no other people in the hallway as he left the building. He approached the right side door to exit the building and pushed the metal bar to open the door. The door opened a few inches, but then jammed, and his right hand slipped off of the bar and went through the glass door. The glass broke into large pieces, one of which hit him across his forehead and nose. He instinctively lifted his left arm, and glass also struck him on his elbow. Mr. Cronin, who wore prescription eyeglasses, testified that blood was covering his |7glasses so he pulled his shirt up over his head in an attempt to stop the bleeding. He exited through the left side door and sat against the building. He did not remember anyone coming to his aid, but testified that approximately ten or fifteen minutes after the accident, paramedics arrived and took him to Chalmette Medical Center.
 

 The incident report completed by the security officer at the Port indicated that a person, Corey Campbell, was actually behind Mr. Cronin in the hallway and saw the incident happen. The person related that Mr. Cronin pushed the door open causing the glass to break.
 
 [3]
 
 The eyewitness did not report that Mr. Cronin was agitated, but that he merely pushed on the door and the glass broke. When Mr. La-bat was asked about the presence of Mr. Campbell, Mr. Labat had no idea who he was, nor did he recall seeing anyone else in the hallway.
 

 There was also a pedestrian accident report prepared by Jennifer Carreras, a compliance supervisor for the OMV. Her report does not mention Mr. Labat as a witness, but does list Corey Campbell as an eyewitness.
 

 In reviewing Mr. Labat’s testimony, we note that the issue of his credibility based on the trial court’s observations of variations of demeanor, tone of voice, and body language, is not present in this case because the trial court did not have the benefit of live testimony from Mr. Labat. Our review of his testimony reveals substantial inconsistencies in his testimony that call into question whether his testimony is worthy of belief.
 

 ^Accordingly, we find that the trial court erred in relying on the questionable testimony of Ernest Labat in finding Mr.
 
 *51
 
 Cronin solely responsible for his injuries. Ms. Lanier testified that Mr. Cronin was agitated about the possibility of paying a fine, but he was calm, not cursing or yelling, when he left her office.
 

 ASSIGNMENT OF ERROR NO. 2:
 

 Mr. Cronin argues that the trial court erred in not awarding him damages for his injuries. Before deciding this issue, however, we must determine if the Port bears any responsibility for this incident. The trial court made no findings of fact regarding the liability of the Port; however, we can infer from its findings that it found the Port had none. After a thorough review of the record, we find the trial court was manifestly erroneous.
 

 A. Liability of the Port:
 

 Louisiana Civil Code Article 2317 provides that “we are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.”
 

 Louisiana Revised Statute 9:2800, which limits the Port’s liability as a public entity, states, in pertinent part:
 

 A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
 

 [[Image here]]
 

 C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the |9public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity had a reasonable opportunity to remedy the defect and has failed to do so.
 

 D. Constructive notice shall mean the existence of facts which infer actual knowledge.
 

 Because of the limitations set forth in R.S. 9:2800, the duty owed by the Port under either strict liability or negligence theories is the same.
 
 See Henderson v. Nissan Motor Corp.
 
 U.S.A., 03-606, pp. 5-6 (La.2/6/04), 869 So.2d 62, 66;
 
 Graves v. Page,
 
 96-2201, p. 9 (La.11/7/97), 703 So.2d 566, 570. The plaintiff must prove that the Port had custody and control of the door in question, that there was a defect in the door that created an unreasonable risk of harm, that the defective condition caused plaintiffs injuries, and that the Port had knowledge of the hazardous condition.
 
 Williams v. Cooper,
 
 05-0654, 05-0655, p. 5 (La.App. 4 Cir. 1/25/06), 926 So.2d 571, 574.
 

 It is undisputed that the Port had custody of the building and was responsible for repairs and maintenance. Robert Scafidel, the executive director of the Port, testified that the Port was responsible for maintenance of the building and the grounds. The Port had its own maintenance department. It is further undisputed that the Port was aware of the defect in the door. Mr. McCaskell testified that he had reported the problems with the door to Port personnel on numerous occasions, and although attempts were made to repair it, it was never fixed. Ms. Lanier also testified that she reported problems with the door to John Cantrelle, the security guard for the Port. There was no testimony from any Port personnel that they were not aware of the problem with the door. Although argued by the Port, we find it irrelevant that no recent reports had been made about the door. The fact exists that Lothere were reported problems with the
 
 *52
 
 door, and that Port maintenance had unsuccessfully attempted to fix them.
 

 In 1972, the Louisiana legislature enacted La. R.S. 40:1711 and 40:1713 dealing with the use of safety glass in hazardous locations. Hazardous locations included installations in framed or unframed entrance doors in commercial or public buildings. Justice Lemmon, in a concurrence, noted that although the above statutes could not be used to impose criminal sanctions as to buildings constructed prior to enactment of the statutes, they could be applied by analogy as one of the factors to be considered in determining the civil duty to replace plate glass with safety glass in dangerous areas of existing buildings.
 
 Wilkinson v. Hartford Accident and Indemnity Co.,
 
 411 So.2d 22, 25, n. 1 (La.1982).
 

 Michael Franzel, an expert safety professional with expertise in accident reconstruction and hazard recognition and control, testified for the plaintiff. It was his opinion that exit doors should not be locked while a building is occupied. If, however, doors are locked for any reason, at a minimum, the locked door should be clearly marked. He further opined that if the door Mr. Cronin attempted to use to exit the building had opened properly, the accident would not have occurred.
 

 The Port offered no expert testimony to controvert Mr. Franzel’s testimony. Rather, it argues on appeal that the plaintiffs argument — because there was plate glass in door, it was unreasonably dangerous — is flawed. The Port argues that Mr. Cronin attempts to circumvent the trial court’s well supported factual findings that the door did not pose an unreasonable risk of harm. First, we note that the trial court did not make any explicit findings of fact in this regard; rather, the factual findings are inferable from the trial court’s allocation of fault, i.e., one hundred percent fault to Mr. Cronin.
 

 InThe Port also correctly notes that cases cited by Mr. Cronin do not hold that plate glass, alone, in unreasonably dangerous. Instead, the cases were decided on the specific factual scenarios of each case. While we agree with the Port’s assessment of the holdings, we are also directed by the jurisprudence to examine the specific and unique facts of the case at hand.
 

 Despite the Port’s contention that the record contains an abundance of evidence to support that the door did not pose an unreasonable risk of harm, this Court has not discovered such evidence in this record. The door in question was unquestionably in a high volume passageway for people entering and leaving the OMV. Both Mr. McCaskell and Ms. Lanier testified that both employees and customers used these particular doors almost exclusively due to their proximity to the parking lot. It was also uncontroverted that the door in question was defective in that it was difficult to open completely because it would “stick” and then quickly close. Ms. Lanier testified that she stopped using the door entirely. Mr. McCaskell resorted to locking the door after his efforts to get it fixed failed.
 

 Furthermore, the breach of duty owed by the Port cannot be totally excused on the basis of victim fault. There is simply insufficient evidence in this record to support that Mr. Cronin was agitated to such a degree that he slammed his hand through the glass door. There is evidence that Mr. Cronin was upset, but not that he ignored the metal bar on the door. Mr. Cronin testified that he pushed on the metal bar on the door, but that his hand slipped off and went through the glass. Neither Mr. Campbell, the eyewitness named on the accident reports, nor Mr. Labat testified that Mr. Cronin did not at
 
 *53
 
 least attempt to use the metal bar to open the door. Whether the door was locked or unlocked is of no moment. If the door had been locked, there was no sign to warn a person exiting the building. If the Indoor had been left unlocked by Mr. Labat, there is ample evidence that the door was heavy and would stick and not open entirely. Either scenario created an unreasonable risk of harm, especially in light of the fact that the door contained plate glass.
 

 B. Quantum:
 

 Having decided that the Port bore some responsibility for Mr. Cronin’s injuries, and because the record before us is complete, we will decide the issue of quantum.
 

 1. Past and future medicals, pain and suffering:
 

 The record reveals that Mr. Cronin suffered a cut to his forehead from his hairline to his eyebrow, that his nostril was almost completely cut off, and that he had a cut to his elbow. His head injuries were sutured without anesthesia and his elbow was sutured with local anesthesia. Dr. Shamsnia, a neurologist, testified at trial that he treated Mr. Cronin almost exclusively after the accident. Mr. Cronin initially presented with evidence of a deep cut to his forehead, right nostril and left elbow. He complained of headaches, insomnia, numbness in his left arm and hand and neck pain. On examination, Mr. Cronin had neck spasms, a differentiation in temperature from right hand to left, indicating possible reflex sympathetic dystrophy (explained as a nerve injury that wraps around blood vessels). An MRI revealed a mild brain atrophy related to the plate glass falling and striking his head.
 

 Over the course of his treatment, Dr. Shamsnia prescribed various medications in an attempt to relieve Mr. Cronin’s headache pain. He also prescribed a variety of muscle relaxants and anti-depressants.
 

 Approximately 3½ years after the incident, Dr. Shamsnia allowed Mr. Cronin to return to light duty work; however, the doctor did not instruct Mr. 11sCronin as to what light duty meant. Mr. Cronin attempted to return to work painting or hanging drywall, both jobs he had performed prior to the accident. However, because of the loss of use of two Angers on his left hand, it was almost impossible to hold a mud tray for hanging drywall or a can of paint. Because of his headaches, his balance was unstable, causing him to fall backwards off of a ladder. Despite these difficulties, Mr. Cronin would still wait in front of Home Depot or Lowe’s stores looking for day jobs to support his family. Dr. Shamsnia eventually told Mr. Cronin that he should stop working as a laborer.
 

 Dr. Shamsnia made five separate diagnoses: 1) mild brain injury; 2) post-traumatic headaches; 3) hemifacial spasm; 4) ulnar neuropathy; and 5) cervical radiculo-pathy. After five years of treatment, it was his opinion that Mr. Cronin had reached maximum medical improvement. He testified that all injuries were directly related to the accident on January 11, 2002.
 

 Dr. Susan Andrews, a neuropsychologist, testified that she performed a battery of tests on Mr. Cronin. She concluded that he had mild deficits in judgment, alertness and humor. She also found that he had significant depression, anxiety and general demoralization. Mr. Cronin displayed no signs of malingering. Dr. Andrews recommended that Mr. Cronin attend vocational rehabilitation, long-term occupational therapy for his arm and hand issues, and psychotherapy for his depression, anxiety and sleep issues.
 

 
 *54
 
 The Port submitted the deposition testimony of Dr. F. William Black, a neuropsy-chologist. Dr. Black examined Mr. Cronin and found he had no brain or cognitive dysfunction. His language function and memory function were within normal ranges. His visual confrontation — looking at pictured objects and naming them — was within the low average range. His motor skills with his dominant right [ 14hand were normal, but his left hand was slightly impaired, which the doctor related to a mild ulnar neuropathy. Dr. Black concluded that Mr. Cronin had a generalized anxiety disorder, a major depressive disorder, an ulnar nerve injury, occupational and economic problems, physical discomfort and a mild sensory/pain disorder. He recommended, similarly to Dr. Andrews, that Mr. Cronin seek psychiatric help to determine the source of his emotional distress. He also recommended vocational rehabilitation and to continue his course of treatment with Dr. Shamsnia relative to his sleep disorder.
 

 On cross-examination, Dr. Black admitted that his opinions about Mr. Cronin’s ability to work were from a purely neurop-sychological perspective.
 

 The Port argues that Dr. Black determined Mr. Cronin had no residual brain injury as Dr. Shamsnia concluded; however, Mr. Cronin points out that Dr. Black is not a medical doctor and is therefore unqualified to express a medical opinion on this subject.
 

 The Port also argues that because Mr. Cronin only spent a few hours in the emergency room and was not admitted to the hospital, his injuries are mild. Our review of the records indicates that Mr. Cronin was not admitted because the bleeding had been stopped and the cuts had been sutured. A CT scan appeared to be normal. The Port also argues that Mr. Cronin has not had any surgeries to correct his “ailments.” Dr. Shamsnia explained that a surgery recommended by a plastic surgeon Mr. Cronin had seen to remove his sutures, was not one he would recommend. He testified that the surgery was to attempt to realign nerve endings that had been severed, and had a low success rate. Other than that surgery, Dr. Shamsnia did not identify, nor did any physician retained by the Port, any surgeries from which Mr. Cronin would benefit.
 

 | ^According to the record, Mr. Cronin has incurred past medical expenses of $38,168.17. Mr. Cronin continues to treat with Dr. Shamsnia approximately every three months at $125.00 per visit. Dr. Shamsnia also recommended Mr. Cronin submit to physical therapy for his neck, and Botox injections for management of the pain and spasms in his forehead at a cost of $1,000 per injection. The doctor estimated that Mr. Cronin would require approximately $1,000 in future medications.
 

 Jurisprudence reveals a range of awards from $450,000 to $220,000 for brain injuries. In
 
 Dang v. New Hampshire Ins. Co.,
 
 00-1554 (La.App. 4 Cir. 10/10/01), 798 So.2d 1204, this Court affirmed the granting of a judgment notwithstanding the verdict whereby the trial court increased the jury award from $10,000 to $250,000. Ms. Dang was struck by a vehicle while crossing the street, and sustained a closed-head injury resulting in chronic headaches, depression, difficulty with concentration, attention and reduced motor skills. The injuries appear to be closely aligned with those proven to have been suffered by Mr. Cronin. We therefore award $250,000 for his brain injury.
 

 The neurological injuries and scarring incurred by Mr. Cronin are two-fold. He has a permanent, disfiguring scar across his forehead that also causes him
 
 *55
 
 spasms and hemi-facial pain. He has a scar on his elbow resulting from a deep cut that damaged the ulnar nerve. Dr. Shamsnia also reported cervical radiculo-pathy probably caused by the blow to his head.
 

 In
 
 Brumfield v. Coastal Cargo Co.,
 
 99-2756 (La.App. 4 Cir. 6/28/00), 768 So.2d 684, this Court affirmed a general damage award of $200,000 for a plaintiff who was struck in the face with an object during a fight. He sustained small facial scars and suffered from headaches that prevented him from returning to work.
 

 In
 
 Jones v. Peyton Place, Inc.,
 
 95-0574 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, the plaintiff tripped over a ripple in carpet, causing him to crash through a glass door. He sustained cuts with residual scarring to his face, and injuries to his neck and lower back. The appeals court affirmed an award of $5,000 for his neck injury, $80,000 for pain and suffering relative to the cuts and lacerations, and reduced the jury’s award to $25,000 for permanent disfigurement.
 

 Based on the above, we award Mr. Cronin $200,000 for his neurological injuries, scarring, and physical pain and suffering. Both of the above awards encompass the cost of future medical treatment. We also award $38,168.17 for past medicals.
 

 2. Lost past and future wages:
 

 Dr. Randy Rice, an expert economist, testified that, using figures provided to him by Bobby Roberts, plaintiffs vocational evaluation expert, Mr. Cronin had an earning capacity as a painter of $18,000 per year. However, the evidence reveals that Mr. Cronin left school after the ninth grade to work as a painter, and from 1995 through 2001, earned an average of $5,000 per year. Wages reported for 2002 were $7,000, no wages were reported for 2003, 2004 or 2005, wages for 2006 were $7667, and for 2007 were $2800. Thus, from the time of the accident until trial, Mr. Cronin’s actual wages were $17,467, or an average of $2,405. Based on the above, we calculate his past lost wages at $16,000.
 

 Dr. Rice also calculated Mr. Cronin’s work life expectancy from the time of trial to be 26.14 years. Although Dr. Kenneth Boudreaux, whose deposition was entered into evidence, found that Mr. Cronin had no future lost wages considering that he could find sedentary work paying more than he earned pre-accident, we must consider his injuries, particularly his depression and headaches, when | ^calculating his future lost wages. In calculating lost future wages we consider that Mr. Cronin was only 23 years old at the time of this accident and had not reached his full earning potential at that time, and that Nancy Favalora, the Port’s vocational rehabilitation counselor, testified that there are sedentary jobs available that Mr. Cronin is capable of performing.
 

 To arrive at our future lost wage award, we calculated the difference between what Dr. Rice testified Mr. Cronin could make as a painter and the average wage of the jobs listed by Ms. Favalora, and multiplied that figure by Mr. Cronin’s work life expectancy. We award Mr. Cronin $78,000 in lost future wages.
 

 B. Comparative Fault:
 

 Although we find that the trial court was manifestly erroneous in finding Mr. Cronin solely at fault for his injuries, we cannot ignore the testimony of Ms. Lanier, who stated that Mr. Cronin was upset with the prospect of a fine, despite his being polite with her. We also must take note of the incident report completed by the OMV that indicated Ms. Lanier said Mr. Cronin was “very agitated” when he
 
 *56
 
 left her desk. Thus, we find Mr. Cronin ten percent at fault for his injuries.
 

 CONCLUSION:
 

 Accordingly, we reverse the judgment of the trial court and award Mr. Cronin $523,951.35, plus interest from
 
 the
 
 date
 
 of
 
 judicial demand, each party to bear its own costs.
 

 REVERSED AND RENDERED.
 

 [1]
 

 . Michelle and Robert Cronin were married prior to accident, but divorced. They were not remarried until after the accident.
 

 [2]
 

 . Mr. Labat died prior to trial.
 

 [3]
 

 . This accident occurred prior to Hurricane Katrina. The person named on the incident report was not called to testify.